THE PEOPLE OF THE STATE OF ILLINOIS *ex rel.* JOSEPH E. BIRKETT *et al.*, Appellees and Cross-Appellants, v. THE CITY OF CHICAGO, Appellant and Cross-Appellee.

*Opinion filed October 18, 2002.*

Mara S. Georges, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon and Jane Elinor Notz, of counsel), and Emily Nicklin and Matthew Regan, of Chicago, and Christopher Landau and Kannon K. Shanmugam, of Washington, D.C., all of Kirkland & Ellis, for appellant and cross-appellee.

Joseph E. Birkett, State's Attorney, of Wheaton (Nancy J. Wolfe, Assistant State's Attorney, of counsel), and Joseph V. Karaganis, A. Bruce White and John W. Kalich, of Karaganis, White & Magel, Ltd., of Chicago, and Robert G. Black, of Naperville, for appellees.

Benjamin Ferrucci and Scott P. Lewis, of Palmer & Dodge, L.L.P., of Boston, Massachusetts (Patricia A. Hahn, of Washington, D.C., of counsel), for *amicus curiae* Airports Council International—North America.

David A. Berg, of Washington, D.C., for *amicus curiae* Air Transport Association of America, Inc.

William N. Hall, Roger A. Keller, Jr., and Susan A. MacIntyre, of Winston & Strawn, of Washington, D.C., for *amicus curiae* American Airlines, Inc.

Paul W. Schroeder and Jeffrey R. Weiland, of Jones,

Day, Reavis & Pogue, of Chicago, for *amicus curiae* Illinois Department of Transportation.

John B. Kincaid, of Mirabella & Kincaid, P.C., of Wheaton, for *amici curiae* Rosa Rodriguez *et al.*

*Amicus curiae* Jesse L. Jackson, Jr., of Homewood.

JUSTICE THOMAS delivered the opinion of the court:

Plaintiffs, Joseph E. Birkett, State's Attorney of Du Page County, on behalf of the People of the State of Illinois, the County of Du Page, the Village of Bensenville, the City of Elmhurst, and the City of Wood Dale, filed a two-count amended complaint seeking (1) a declaration that the City of Chicago was constructing certain improvements at O'Hare International Airport in violation of the Illinois Aeronautics Act (Act) (620 ILCS 5/1 *et seq.* (West 2000)); and (2) an order enjoining the further construction of any such improvements until such time as the City complied with the Act. The circuit court of Du Page County entered summary judgment in the City's favor and denied plaintiffs' motion for partial summary judgment and injunctive relief. In addition, the trial court denied the request of United States Congressman Henry J. Hyde and State Senator James "Pate" Philip to intervene as plaintiffs. Plaintiffs appealed, and the appellate court concluded that entry of summary judgment in the City's favor was erroneous. 329 Ill. App. 3d 477. We granted the City's petition for leave to appeal. 177 Ill. 2d R. 315(a). In addition, we allowed the submission of several *amicus curiae* briefs supporting both the City and plaintiffs. 155 Ill. 2d R. 345.

## BACKGROUND

Section 47 of the Act (620 ILCS 5/47 (West 2000)) prohibits a municipality from making "any alteration or

extension of an existing airport *** for which a certificate of approval has not been issued by the [Illinois Department of Transportation (IDOT)]." As the owner and operator of O'Hare International Airport, the City routinely undertakes a wide variety of projects designed to improve airport facilities. These projects generally fall into one of three categories: (1) "airfield" development, which includes runways, taxiways, aprons, hold pads, cargo areas, hangars, and other areas designed to facilitate the movement of aircraft; (2) "terminal" development, which includes terminals, concourses, and other areas designed to facilitate the movement of people through the airport; and (3) "landside" or "ground transportation" development, which includes roadways, parking facilities, mass transit, and other facilities designed to facilitate the movement of vehicles to and from the airport terminals. The City admits that it previously has undertaken extensive terminal and ground transportation improvements at O'Hare without first obtaining a certificate of approval from IDOT and that it intends to continue undertaking such improvements in the future. These improvements include new and renovated terminals, renovated concourses, new and renovated roadways, and expanded parking facilities.

On December 22, 1995, plaintiffs filed a two-count amended complaint against the City. Count I, an action in *quo warranto*, alleged that, in clear violation of section 47, the City was undertaking substantial terminal and ground transportation improvements at O'Hare without first obtaining a certificate of approval from IDOT. Specifically, count I alleged that the City "currently has under construction tens of millions of dollars of physical alterations to [O'Hare]" and "in the past has constructed, or plans to build several hundred million dollars of additional construction projects at O'Hare." Accordingly, plaintiffs sought both a declaration that the City's ac-

tions were without authority and an order prohibiting the City from "constructing current and proposed alterations at O'Hare" without first obtaining a certificate of approval from IDOT. Count II, which was brought specifically under the Act, incorporated all of the allegations of count I, adding that "the intended primary purpose of much of the recent, ongoing and planned construction at O'Hare Airport is to incrementally expand the capacity of the airport" both to the detriment of neighboring communities and without the approval of IDOT. Count II sought an order prohibiting the "continued construction of current and proposed piecemeal elements of Chicago's construction program at O'Hare" without first obtaining a certificate of approval from IDOT.

On December 16, 1996, the trial court allowed Congressman Hyde and State Senator Philip to intervene as plaintiffs. The trial court later vacated this decision, concluding that Congressman Hyde and Senator Philip did not have standing to intervene.

On June 6, 2000, the City filed a motion for summary judgment. Plaintiffs responded with a cross-motion seeking both partial summary judgment and an injunction against "further physical alterations at O'Hare until these alterations are submitted to the State for a certificate of approval, and the State has issued a certificate of approval." After hearing arguments and reviewing the parties' briefs, the trial court entered summary judgment in the City's favor and denied plaintiffs' motion in its entirety. In so ruling, the trial court explained that the phrase "any alteration or extension of an existing airport," as set forth in section 47, is ambiguous. After considering both the Act as a whole and the IDOT regulation construing section 47 (see 92 Ill. Adm. Code § 14.640 (2000)), the trial court determined that section 47 requires IDOT certification only for those

alterations and extensions that affect "flight safety, glide path, obstruction of approaches, and things of that matter." Because none of the projects targeted by plaintiffs' complaint in any way implicated such matters, the trial court concluded that IDOT certification for those projects was unnecessary.

Plaintiffs appealed, and the appellate court affirmed in part, reversed in part, and remanded. 329 Ill. App. 3d 477. Initially, the appellate court agreed with the trial court's conclusion that section 47 requires IDOT certification only for those projects that impact runways or flight patterns. 329 Ill. App. 3d at 484-85. The appellate court then held, however, that the City may not evade compliance with section 47's certification requirement by segmenting a comprehensive project that includes alterations to runways or flight patterns into a series of smaller pieces. Thus, because there is evidence in the record to suggest that the contested terminal and ground transportation improvements to O'Hare are but one component of an overall plan that includes new or reconfigured runways, the appellate court concluded that the entry of summary judgment in the City's favor was erroneous. 329 Ill. App. 3d at 485. The appellate court additionally held that (1) plaintiffs were not entitled to injunctive relief; (2) federal law does not preempt section 47's certification requirement; and (3) the trial court's refusal to allow Congressman Hyde and Senator Philip to intervene was not an abuse of discretion. 329 Ill. App. 3d at 486-91.

## ANALYSIS

Three issues are presented for our review: (1) whether section 47 requires the City to obtain IDOT certification before undertaking the terminal and ground transportation improvements at issue; (2) if so, whether section 47's certification requirement is preempted by federal law; and (3) whether the trial court's refusal to

allow Congressman Hyde and Senator Philip to intervene was an abuse of discretion. Before reaching these issues, however, we must briefly consider whether this case is appropriate for our review at this time.

## Propriety of Supreme Court Review

Plaintiffs argue that, due to certain changes in the City's plans for terminal and ground transportation improvements at O'Hare, this case presently rests upon an uncertain factual foundation and therefore is inappropriate for review at this time. Specifically, plaintiffs point to a series of news reports suggesting that, since the appellate court filed its judgment in this case, the City has announced that the World Gateway Project, which encompasses many of the terminal and ground transportation projects at issue in this case, may not go forward as planned. According to plaintiffs, in light of the uncertainty concerning which, if any, portions of the World Gateway Project remain viable, any decision by this court at this time would be purely advisory. Plaintiffs therefore urge this court to dismiss this appeal and remand the cause for additional fact-finding in accordance with the appellate court's opinion.

We decline plaintiffs' invitation to dismiss this appeal. First, the issue in this case has never turned upon knowing with certainty what terminal and ground transportation improvements the City seeks to undertake at O'Hare. Plaintiffs' complaint did not seek to enjoin only those terminal and ground transportation improvements at O'Hare that are part of the World Gateway Project, nor did plaintiffs' complaint identify with any degree of specificity what projects they were seeking to enjoin. Rather, plaintiffs' complaint sought to enjoin the City from "constructing current and proposed alterations at O'Hare," whatever those alterations might prove to be.

Second, in the course of this appeal, this court al-

lowed the City to file an affidavit from John F. Harris, the first deputy commissioner of the City of Chicago department of aviation. In that affidavit, Harris testifies that, notwithstanding the World Gateway Project's uncertain future, the City still intends to undertake substantial improvement projects at O'Hare without seeking IDOT's approval, including the construction of a new terminal and the extension of an existing concourse. Thus, we know with certainty that the City still intends to undertake at least some of the improvements that plaintiffs' complaint seeks to enjoin.

Finally, if plaintiffs genuinely believed that the City no longer intends to undertake the terminal and ground transportation improvements targeted in plaintiffs' complaint, then plaintiffs need only dismiss their complaint to end this litigation. The fact that plaintiffs are instead seeking a dismissal of this appeal—and with it the preservation of the appellate court's decision on the merits—suggests that plaintiffs fully expect the City to proceed with at least some terminal and ground transportation improvements at O'Hare. For these reasons, we decline to dismiss this appeal.

### Necessity of IDOT Certification

The central question in this case is whether the City must obtain IDOT certification before undertaking the terminal and ground transportation improvements at issue. This question is one of statutory construction, and our analysis is guided by familiar principles.

The fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent. *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 503-04 (2000). The best indication of legislative intent is the statutory language, given its plain and ordinary meaning. *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 479 (1994). Where the language is clear and unambiguous, we must apply the statute without resort

to further aids of statutory construction. *Davis v. Toshiba Machine Co., America*, 186 Ill. 2d 181, 184-85 (1999). If the statutory language is ambiguous, however, we may look to other sources to ascertain the legislature's intent. *People v. Ross*, 168 Ill. 2d 347, 352 (1995). A court will give substantial weight and deference to an interpretation of an ambiguous statute by the agency charged with administering and enforcing that statute. *Bonaguro v. County Officers Electoral Board*, 158 Ill. 2d 391, 398 (1994). Indeed, a reasonable construction of an ambiguous statute by the agency charged with that statute's enforcement, if contemporaneous, consistent, long-continued, and in concurrence with legislative acquiescence, creates a presumption of correctness that is only slightly less persuasive than a judicial construction of the same act. *People ex rel. Watson v. House of Vision*, 59 Ill. 2d 508, 514-15 (1974). A statute is ambiguous if it is capable of being understood by reasonably well-informed persons in two or more different ways. *People v. Jameson*, 162 Ill. 2d 282, 288 (1994). The construction of a statute is a question of law that is reviewed *de novo*. *In re Estate of Dierkes*, 191 Ill. 2d 326, 330 (2000).

The statute at issue in this case is section 47 of the Illinois Aeronautics Act, which states:

> "It shall be unlawful for any municipality or other political subdivision, or officer or employee thereof, or for any person, to make any alteration or extension of an existing airport or restricted landing area, or to use or operate any airport or restricted landing area, for which a certificate of approval has not been issued by the Department." 620 ILCS 5/47 (West 2000).

Plaintiffs argue that section 47 unambiguously requires the City to obtain IDOT certification before undertaking the substantial terminal and ground transportation improvements at issue. The City, by contrast, argues that section 47 is ambiguous because, as plaintiffs concede, not every "alteration or extension of an existing airport"

necessitates IDOT's approval. Instead, an alteration or extension of an existing airport must cross some threshold of significance before IDOT certification becomes necessary, and section 47 offers no guidance whatsoever as to when that threshold is crossed.

We agree with the City. As used in section 47, the phrase "any alteration or extension of an existing airport" is ambiguous. As both parties acknowledge, strict enforcement of the statute's plain language leads to patently absurd results, such as requiring IDOT certification for the installation of a new drinking fountain or the replacement of worn carpeting in any O'Hare facility. At the same time, neither party disputes that the phrase "any alteration or extension of an existing airport" includes the construction of a new runway. The difficulty lies in discerning the point in this continuum at which a project becomes less like a drinking fountain and more like a runway—in other words, the point at which IDOT certification becomes necessary. Unfortunately, the plain language of section 47 offers no guidance on this point.

Because strict application of the phrase "any alteration or extension of an existing airport" leads to patently absurd results, and because nothing in section 47 narrows the reach of this phrase, we are compelled to look beyond section 47 for assistance in construing this statute's scope. Fortunately, we need not look far, as IDOT has issued a regulation specifically construing the ambiguous language at issue. Enacted in 1985, the regulation provides:

"The phrase, 'alteration or extension', shall include any of the following:

a) Any material change in the length, width or direction of runways or landing strips;

b) Construction or installation of any building or other structure on the airport property which would extend above an approach slope or a transition slope or turning zone;

c) Planting or permitting to grow any growth or placement of any other obstacle on the airport property which would extend above an approach slope or a transition slope or turning zone." 92 Ill. Adm. Code § 14.640 (1998).

Unlike section 47, this regulation provides clear and unambiguous guidance as to the types of improvements for which IDOT certification is necessary. The regulation itself informs us that the phrase "alteration or extension" includes any improvement that (1) materially alters the length, width, or direction of a runway or landing strips; or (2) extends above an approach slope, transition slope, or turning zone. And established rules of statutory construction inform us that, when a statute provides a list that is not exclusive, as section 14.640 does ("[t]he phrase, 'alteration or extension,' shall *include* \*\*\*"), the class of unarticulated things will be interpreted as those that are similar to the named things. *Zekman v. Direct American Marketers, Inc.*, 182 Ill. 2d 359, 369 (1998); see also *Northern Illinois Automobile Wreckers & Rebuilders Ass'n v. Dixon*, 75 Ill. 2d 53, 58 (1979) (administrative rules and regulations are construed under the same standards that govern the construction of statutes). Clearly, the common feature of the alterations and extensions identified in section 14.640 is the direct impact that each of them has on runway layout and/or flight paths. Stated differently, IDOT requires certification only for those alterations or extensions on the ground that materially alter runway size or layout and/or interfere with or otherwise obstruct an approach slope, transition slope, or turning zone.

Of course, the mere fact that IDOT construes section 47 in this manner does not end our inquiry. While courts afford considerable deference to an agency's interpretation of a statute that it administers, that interpretation is not binding and will be rejected if erroneous. *Denton v. Civil Service Comm'n*, 176 Ill. 2d 144, 148 (1997). That

said, we conclude that IDOT's construction of section 47 is entirely reasonable and not the least bit erroneous.

As noted above, section 47 is silent as to the types of alterations or extensions that require IDOT certification. However, in ascertaining the meaning of a statute, a court should not read that statute in isolation but in the context of the Act as a whole. *People v. Trainor*, 196 Ill. 2d 318, 322 (2001). When section 47 is considered in the context of the Act as a whole, it becomes clear that IDOT's construction of that section is sound. Section 25 of the Act, for example, sets forth the purpose of the Act as a whole:

"It is hereby declared that the purpose of this Act is to further the public interest and aeronautical progress by providing for the protection and promotion of safety in aeronautics; by cooperating in effecting a uniformity of the laws relating to the development and regulation of aeronautics in the several states; by revising existing statutes relative to the development and regulation of aeronautics so as to grant to a state agency such powers and impose upon it such duties that the state may properly perform its functions relative to aeronautics and effectively exercise its jurisdiction over persons and property within such jurisdiction, may assist in the promotion of a State-wide system of airports, may cooperate with and assist the political subdivisions of this State and others engaged in aeronautics, and may encourage and develop aeronautics; by establishing uniform rules and regulations, consistent, so far as practicable, with Federal rules and regulations, in order that those engaged in aeronautics of every character may so engage with the least possible restriction, consistent with their safety and with the safety and the rights of others; and by providing for cooperation with the Federal authorities in the development of a national system of civil aviation and for coordination of the aeronautical activities of those authorities and the authorities of this State by assisting in accomplishing the purposes of federal legislation and eliminating costly and unnecessary duplication of functions properly in the province of federal agencies." 620 ILCS 5/25 (West 2000).

Nothing in these declarations evinces any degree of legislative concern with an airport's terminal or ground transportation facilities. However, phrases such as "safety in aeronautics," "the development and regulation of aeronautics in the several states," "a State-wide system of airports," "the development of a national system of civil aviation," and "eliminating costly and unnecessary duplication of functions properly in the province of federal agencies" reveal a clear legislative interest in maintaining a safe, uniform, and coherent system of flight patterns and air traffic.

Similarly, section 48 of the Act, which enumerates the standards for issuing certificates of approval under section 47, reveals that runway layout and flight patterns—not terminal and ground transportation facilities—are the primary legislative priorities underlying the certification requirement:

"In determining whether it shall issue a certificate of approval for any airport or restricted landing area, or any alteration or extension thereof, the Department shall take into consideration its proposed location, size and layout, the relationship of the proposed airport or restricted landing area to the then current national airport plan, the then current Federal airways system, the then current State airport plan, and the then current State airways system, whether there are safe areas available for expansion purposes, whether the adjoining area is free from obstructions based on a proper glide ratio, the nature of the terrain, the nature of the uses to which the proposed airport or restricted landing area will be put, the possibilities for future development, and such other factors as, under the circumstances, it regards as having an important bearing thereon." 620 ILCS 5/48 (West 2000).

Again, nothing in the preceding language reflects any degree of legislative concern with an airport's terminal or ground transportation facilities. By contrast, the legislatively mandated considerations of "the then current national airport plan, the then current Federal

airways system, the then current State airport plan, and the then current State airways system," "proper glide ratios," and "the nature of the terrain" make sense only in the context of maintaining a safe, uniform, and coherent system of flight patterns and air traffic. Thus, to the extent that IDOT's interpretation of section 47 requires certification only for those alterations or extensions that materially alter runway size or layout and/or interfere with or otherwise obstruct an approach slope, transition slope, or turning zone, that interpretation dovetails perfectly with the public policy considerations identified in other relevant portions of the Act.

Plaintiffs maintain, however, that IDOT's interpretation conflicts with the definition of "airport" as set forth in section 6 of the Act and therefore is not entitled to deference. Section 6 defines "airport" as:

> "any area of land, water, or both, except a restricted landing area, which is designed for the landing and take-off of aircraft, whether or not facilities are provided for the shelter, servicing, or repair of aircraft, *or for receiving or discharging passengers or cargo, and all appurtenant areas used or suitable for airport buildings or other airport facilities, and all appurtenant rights of way*, whether heretofore or hereafter established." (Emphasis added.) 620 ILCS 5/6 (West 2000).

According to plaintiffs, section 6 specifically defines "airport" to include terminals. Thus, if section 47 requires IDOT certification for "any alteration or extension of an existing *airport*," then IDOT certification must be required for any alteration or extension of a terminal. Under IDOT's interpretation, however, certification is *not* required for alterations or extensions of terminals but only for those alterations or extensions that materially alter runway size or layout and/or interfere with or otherwise obstruct an approach slope, transition slope, or turning zone. Because IDOT's interpretation of section 47 defines "airport" more narrowly than does the Act

itself, plaintiffs insist that IDOT's interpretation is not reasonable and therefore not entitled to deference.

Plaintiffs' argument is flawed in two respects. First, contrary to plaintiffs' reading, IDOT's interpretation of section 47 does *not* exempt terminal and ground transportation projects from the certification requirement. On the contrary, IDOT interprets section 47 as requiring certification for any alteration or extension of an existing airport that materially alters runway size or layout and/or interferes with or otherwise obstructs an approach slope, transition slope, or turning zone. While plaintiffs apparently believe that only runway projects could have any of the prohibited effects, this simply is not the case. For example, if the City set out to build a 20-story terminal facility at O'Hare, that project would be subject to IDOT certification, as it would undoubtedly interfere with an approach slope, transition slope, or turning zone. Similarly, if a new O'Hare access road required construction of an overpass that would compromise an existing approach slope, that project too would require IDOT certification. Thus, plaintiffs' assertion that IDOT's interpretation of section 47 conflicts with section 6's definition of "airport" rests upon a fundamental misreading of IDOT's regulation.

This misreading, in turn, leads to the second flaw in plaintiffs' argument. Rather than settling the question at hand, knowing that section 6's definition of "airport" specifically includes terminals merely gets us back to square one. Again, plaintiffs concede that not every alteration or extension of an existing airport—including alterations to existing terminals—requires IDOT certification. Thus, knowing that the Act's definition of "airport" specifically includes terminals tells us nothing, as the critical question remains: What *types* of alterations or expansions to an existing airport require certification? IDOT's interpretation of section 47 answers this ques-

tion quite reasonably, requiring certification only for those alterations or extensions—whether to runways, terminals, ground transportation facilities, or whatever—that materially alter runway size or layout and/or interfere with or otherwise obstruct an approach slope, transition slope, or turning zone.

Finally, we note that IDOT's interpretation of "alteration or extension of an existing airport," as set forth in section 14.640, has remained on the books continuously and unaltered since 1985. More importantly, although the General Assembly has enacted numerous amendments to the Act since section 14.640 was issued in 1985 (see, *e.g.*, Pub. Act 84—1473, eff. January 26, 1987; Pub. Act 87—232, eff. September 3, 1991; Pub. Act 89—345, eff. January 1, 1996; Pub. Act 91—712, eff. July 1, 2000), sections 47 and 48 of the Act have remained perfectly intact. In fact, sections 47 and 48 read exactly the same today as when originally enacted in 1945. As this court explained almost 50 years ago:

> "That the statute has remained unaltered through successive sessions of the General Assembly *** indicates legislative acquiescence in the contemporary and continuous administrative interpretation." *People ex rel. Spiegel v. Lyons*, 1 Ill. 2d 409, 414 (1953).

Here, IDOT's construction of section 47 has stood undisturbed by legislative intervention for more than 17 years, a clear indication that the General Assembly fully acquiesces in that construction.

In sum, as used in section 47, the phrase "any alteration or extension of an existing airport" is ambiguous. IDOT, the agency charged by the General Assembly with the enforcement of that section, has issued a regulation specifically construing the ambiguity at issue. IDOT's interpretation is reasonable on its face, consistent with related portions of the Act, and has been in force continuously for more than 17 years without any intervention from the legislature. In light of these facts, we

choose to defer to IDOT's construction of section 47, which requires certificates of approval only for those alterations or extensions that materially alter runway size or layout and/or interfere with or otherwise obstruct an approach slope, transition slope, or turning zone.

Having concluded that IDOT's interpretation of section 47 is reasonable and entitled to deference, we now must decide whether the trial court properly entered summary judgment in the City's favor. We hold that it did.

Summary judgment is proper where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 2000); *Ragan v. Columbia Mutual Insurance Co.*, 183 Ill. 2d 342, 349 (1998). Like the construction of a statute, the entry of summary judgment is a question of law that is reviewed *de novo. Ragan*, 183 Ill. 2d at 349.

Plaintiffs' complaint raises one central issue— whether the City must obtain IDOT certification before undertaking the substantial terminal and ground transportation improvements at issue. As to this issue, no genuine issue of material fact exists, and the City unquestionably is entitled to judgment as a matter of law. Plaintiffs do not argue, and there is nothing in the record to suggest, that the City's proposed terminal and ground transportation improvements *themselves* will either materially alter runway size or layout and/or interfere with or otherwise obstruct an approach slope, transition slope, or turning zone. On the contrary, plaintiffs' position throughout this litigation has been that IDOT certification is required because the proposed terminal and ground transportation improvements are part of a *larger plan* that ultimately will include material

changes in O'Hare's runway configuration. And while the City concedes that plaintiffs' characterization of the City's long-term plan for O'Hare is accurate, our analysis of section 47 demonstrates that the City's long-term plan for O'Hare is irrelevant to the question of whether IDOT certification is required for the improvements at issue. Again, the only relevant question under section 47 is whether the proposed improvements themselves will either materially alter runway size or layout and/or interfere with or otherwise obstruct an approach slope, transition slope, or turning zone. Nothing in the record suggests that any of the proposed improvements will have that effect, and the circuit court therefore properly entered summary judgment in the City's favor.

In reaching this result, we necessarily reject the appellate court's theory of segmentation, which formed the basis for its determination that a remand for additional fact-finding was necessary. Under the appellate court's analysis, although the City is required to obtain IDOT certification only for those projects that either materially alter runway size or layout and/or interfere with or otherwise obstruct an approach slope, transition slope, or turning zone, the City "cannot evade statutory requirements by segmenting an overall project into smaller pieces." 329 Ill. App. 3d at 485. Thus, because there is evidence in the record suggesting that the proposed terminal and ground transportation improvements are but one component of a larger plan that also includes new or reconfigured runways, the appellate court concluded the entry of summary judgment was erroneous.

Although we have no quarrel with the appellate court's characterization of the evidentiary record in this case, we nevertheless must reject the appellate court's analysis, as it rests upon a faulty premise, namely, that by segmenting the O'Hare expansion project into a series of smaller projects, the City somehow could evade IDOT

certification for material changes to O'Hare's runway system or improvements that obstruct or otherwise interfere with an approach slope, transition slope, or turning zone. One simply does not follow from the other. Assume, for example, that the City undertakes every conceivable terminal and ground transportation improvement—*e.g.*, a new terminal, new parking facilities, new rail service, and new western expressway access—and that all of these projects are explicitly undertaken with runway expansion in mind. The City *still* would have to obtain IDOT certification before initiating the actual runway expansion. And IDOT *still* would have to assess the propriety of the proposed runway expansion in light of the factors set forth in any relevant portions of the Act and/or IDOT regulations. And, on administrative review, this state's courts *still* would have to review the propriety of IDOT's determination solely in light of the relevant legal and statutory standards. Simply put, and contrary to the appellate court's analysis, nothing that the City undertakes *in anticipation of* new or expanded runways can relieve the City of its obligation to obtain IDOT certification for *the construction of* new or expanded runways.

As a final note on the question of IDOT certification, we wish only to direct the City's attention to the counsel offered by the circuit court upon the entry of summary judgment in the City's favor:

> "In making these findings the Court will note that any construction that is made by the City of Chicago it undertakes at its peril unless and until the certificate is received from the Department of Transportation ***. The issue of runways is not before the court and is not germane. So, in short, if the City goes ahead and builds and doesn't ultimately get a certificate of approval for extending runways or doesn't apply for one, then that is the concern only of the City of Chicago."

### Preemption

In light of our conclusion that IDOT certification is

unnecessary for the proposed terminal and ground transportation improvements at issue in this case, we need not decide whether section 47's certification requirement is preempted by federal law.

## Dismissal of Intervening Plaintiffs

The final issue is whether the trial court erred in vacating its decision to allow United States Congressman Henry J. Hyde and State Senator James "Pate" Philip to intervene as plaintiffs in this litigation. We hold that it did not.

Intervention in civil proceedings is governed by section 2—408 of the Code of Civil Procedure (735 ILCS 5/2—408 (West 2000)), which provides in relevant part:

> "(a) Upon timely application anyone shall be permitted as of right to intervene in an action: (1) when a statute confers an unconditional right to intervene; or (2) when the representation of the applicant's interest by existing parties is or may be inadequate and the applicant will or may be bound by an order or judgment in the action; or (3) when the applicant is so situated as to be adversely affected by a distribution or other disposition of property in the custody or subject to the control or disposition of the court or a court officer.
>
> (b) Upon timely application anyone may in the discretion of the court be permitted to intervene in an action: (1) when a statute confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common." 735 ILCS 5/2—408(a), (b) (West 2000).

The purpose of this section is to liberalize the practice of intervention so as to avoid, upon timely application, the relitigation of issues in a second suit which were being litigated in a pending action. *Caterpillar Tractor Co. v. Lenckos*, 84 Ill. 2d 102, 111-12 (1981). Although a party need not have a direct interest in the pending suit, it must have an interest greater than that of the general public, so that the party may stand to gain or lose by the direct legal operation and effect of a judgment in the

suit. *Caterpillar Tractor Co.*, 84 Ill. 2d at 112. The decision to allow or deny intervention, whether permissively or as of right, is a matter of sound judicial discretion that will not be reversed absent an abuse of that discretion. *In re Application of the County Collector of Du Page County for Judgment for Delinquent Taxes for the Year 1992*, 181 Ill. 2d 237, 247 (1998).

Here, we find no basis for reversing the trial court's decision denying Congressman Hyde and Senator Philip's request to intervene. First, Congressman Hyde and Senator Philip have failed to identify any statute that either conditionally or unconditionally confers upon them a right to intervene in this litigation. Although they point to section 33 of the Act, that section applies only to "State, county and municipal officer[s] charged with the *enforcement* of State and municipal laws." (Emphasis added.) 620 ILCS 5/33 (West 2000). As members of the legislative branch, Congressman Hyde and Senator Philip are not charged with the enforcement of state or municipal laws. Consequently, section 33 does not apply to them. Second, Congressman Hyde and Senator Philip argue that they should have been allowed to intervene because they "are both residents of the communities adjacent to O'Hare," "are personally affected by noise and air pollution from O'Hare," and "have personal interests in the welfare of the constituencies they represent." While we have no reason to doubt any of these assertions, Congressman Hyde and Senator Philip overlook the fact that State's Attorney Birkett filed this action on behalf of the citizens of Du Page County, including Congressman Hyde, Senator Philip, and all of their respective constituents. More importantly, Congressman Hyde and Senator Philip do not anywhere suggest that State's Attorney Birkett's representation of their interests may prove inadequate or that their interests do not coincide with those of Birkett or any of the other named plaintiffs.

In light of the forgoing, we conclude that the trial court's denial of Congressman Hyde and Senator Philip's request to intervene was not an abuse discretion.

## CONCLUSION

For the foregoing reasons, the judgment of the appellate court is affirmed in part and reversed in part, and the judgment of the circuit court is affirmed.

*Appellate court judgment affirmed in part and reversed in part; circuit court judgment affirmed.*