# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*Hawthorne Race Course, Inc. v. Illinois Racing Board*, 2013 IL App (1st) 111780

| | |
|---|---|
| Appellate Court Caption | HAWTHORNE RACE COURSE, INC., Plaintiff-Appellant, v. ILLINOIS RACING BOARD, in Their Official Capacity and Not Individually, JOSEPH J. SINOPOLI, Chairman; and JOSEPH N. CASCIATO, W. JACK CHAMBLIN, ANGELO CIAMBRONE, WILLIAM H. FARLEY, TIMOTHY P. MARTIN, JONATHAN P. METCALF, ALLAN M. MONAT, MICHAEL E. MURPHY, PAUL B. SMITH, ROBERT C. WINCHESTER, MARC LAINO, ARLINGTON PARK RACECOURSE, LLC, MAYWOOD PARK TROTTING ASSOCIATION, INC., BALMORAL RACING CLUB, INC., and FAIRMOUNT PARK, INC., Defendants-Appellees. |
| District & No. | First District, Sixth Division<br>Docket No. 1-11-1780 |
| Opinion filed | November 30, 2012 |
| Opinion withdrawn | January 30, 2013 |
| Opinion filed | February 8, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The decisions of the Illinois Racing Board that the percentage of the Horse Racing Equity Trust Fund payable to eligible licensees under the 2008 version of the Racing Act should be the same as that previously distributed under the 2006 version of the Act were upheld, since the Board's decisions were reasonable, contemporaneous, and consistent with its prior interpretation of the statutory language, and the court would defer to the Board's experience and expertise in administering the Act. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CH-24439; the Hon. Nancy J. Arnold, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Richard J. Prendergast, Ltd. (Richard J. Prendergast and Michael T. Layden, of counsel), and Carey, Filter, White & Boland (Michael J. Murray, of counsel), both of Chicago, for appellant. |
| | Seyfarth Shaw LLP, of Chicago (P. Shawn Wood and Marcus L. Mintz, of counsel), for appellee Arlington Park Racecourse, LLC. |
| | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Richard S. Huszagh, Assistant Attorney General, of counsel), for appellee Illinois Racing Board. |
| Panel | PRESIDING JUSTICE LAMPKIN delivered the judgment of the court, with opinion. |
| | Justices Gordon and Reyes* concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff, Hawthorne Race Course, Inc. (Hawthorne), appeals the circuit court's ruling upholding the decision of defendant, the Illinois Racing Board (Board), in interpreting the Illinois Horse Racing Act of 1975 (Racing Act) (230 ILCS 5/54.75 (West 2010)). Plaintiff contends the Board erred in concluding that the percentage of the Horse Racing Equity Trust Fund (Fund) payable to each eligible licensee under the 2008 version of the Racing Act should be the same as that previously distributed under the 2006 version of the statute. Based on the following, we affirm.

¶ 2                                    FACTS
¶ 3    The Fund was initially created in 2006 by Public Act 94-804 (Pub. Act 94-804 (eff. May 26, 2006)) and codified as section 54.5 of the Racing Act (230 ILCS 5/54.5 (West 2006)) (2006 statute). The 2006 statute became effective on May 26, 2006, and had a sunset provision, establishing automatic repeal on May 26, 2008. The Racing Act imposed surcharges on four Illinois riverboat casinos to help support the horse-racing industry, such that the money deposited into the Fund was distributed to organization licensees within the

_____

*Justice Garcia originally sat on the panel of this appeal and participated in its disposition. Justice Garcia is no longer with the appellate court; therefore, Justice Reyes serves in his stead.

industry.[1] Pursuant to the 2006 statute, 60% of the Fund was to be distributed to organization licensees for further distribution at their race meetings as "purses," while the remaining 40% of the Fund was to be distributed to organization licensees to improve, maintain, market, and otherwise operate racing facilities. 230 ILCS 5/54.5(b) (West 2006).

¶ 4    On December 15, 2008, the legislature reenacted the repealed statute with Public Act 95-1008 (Pub. Act 95-1008 (eff. Dec. 15, 2008)), which extended the surcharges on qualifying riverboat casinos for an additional three years. Public Act 95-1008 was codified as section 54.75 of the Racing Act (230 ILCS 5/54.75 (West 2010)) (2008 statute). Public Act 95-1008, section 1, provided that the 2008 statute "re-enacts the provisions of Public Act 94-804 approved in 2006 and determined valid in 2008 by the Illinois Supreme Court [in *Empress Casino Joliet Corp. v. Giannoulias*, 231 Ill. 2d 62, 896 N.E.2d 277 (2008)]." This court upheld the constitutionality of Public Act 95-1008 in *Empress Casino Joliet Corp. v. Giannoulias*, 406 Ill. App. 3d 1040, 942 N.E.2d 783 (2011).

¶ 5    The pertinent language of the 2008 statute was identical to that of the 2006 statute. The relevant language provided:

"(a) *** Moneys in the Fund shall be distributed as directed and certified by the Board in accordance with the provisions of subsection (b).

(b) The moneys deposited into the Fund, plus any accrued interest on those moneys, shall be distributed within 10 days after those moneys are deposited into the Fund as follows:

(1) Sixty percent of all moneys distributed under this subsection shall be distributed to organization licensees to be distributed at their race meetings as purses. ***

(2) The remaining 40% of the moneys distributed under this subsection (b) shall be distributed as follows:

(A) 11% shall be distributed to any person *** who had operating control of a racetrack *** in a county with at least 230,000 inhabitants that borders the Mississippi River and is a licensee in the current year; and

(B) *the remaining 89% shall be distributed pro rata according to the aggregate proportion of total handle from wagering on live races conducted in Illinois *** for calendar years 2004 and 2005 to any person *** who (i) had majority operating control of a racing facility at which live racing was conducted in calendar year 2002, (ii) is a licensee in the current year, and (iii) is not eligible to receive moneys under subparagraph (A) of this paragraph (2).*

The moneys received by an organization licensee under this paragraph (2) shall be used by each organization licensee to improve, maintain, market, and otherwise operate its racing facilities to conduct live racing, which shall include backstretch services and capital improvements related to live racing and the

[1]The Racing Act defines organization licensee as any "person receiving an organization license from the Board to conduct a race meeting or meetings." 230 ILCS 5/3.11 (West 2010).

-3-

backstretch. Any organization licensees sharing common ownership may pool the moneys received and spent at all racing facilities commonly owned in order to meet these requirements.

> *If any person identified in this paragraph (2) becomes ineligible to receive moneys from the Fund, such amount shall be redistributed among the remaining persons in proportion to their percentages otherwise calculated.*" (Emphases added.) 230 ILCS 5/54.75 (West 2010).

¶ 6        As a result of the litigation challenging the constitutionality of the 2006 statute, from May 27, 2006, through the end of May 2008, the casinos paid their respective surcharges into the State's protest fund. After the supreme court upheld the constitutionality of the 2006 statute and prior to the release of the money from the protest fund, the Board invited organization licensees to provide written submissions regarding the construction of section 54.5 of the Racing Act. Position papers were submitted by plaintiff, defendant Arlington Park Racecourse, LLC (Arlington), and jointly by defendants Balmoral Racing Club, Inc. (Balmoral), and Maywood Park Trotting Association, Inc. (Maywood).

¶ 7        In a July 8, 2009, memorandum, the Board's staff issued an opinion regarding the interpretation of the 2006 statute, and in particular the language of subsection (b)(2). See 230 ILCS 5/54.5(b)(2) (West 2006). In the memorandum, the Board concluded that there were six qualifying entities that held "majority operating control" of a racing facility at which live racing was conducted in 2002, namely, plaintiff, defendant Arlington, defendant Balmoral, defendant Maywood, defendant Fairmount Park, Inc. (Fairmount), and National Jockey Club (National). Next, the Board interpreted the language of the statute that required an entity to be a licensee in the "current year" to mean the year in which the distribution from the Fund, or protest fund in that instance, was to be made. When interpreting the statute, the Board considered the complicated circumstances at issue, in that, due to the litigation surrounding the 2006 statute, more than three years had passed since the legislation had been enacted and the casinos had begun making payments into the protest fund; however, in concluding that the legislature intended "current year" to mean year of distribution, the Board relied on the legislative intent of the Racing Act, namely, to improve and grow the horse-racing industry.

¶ 8        Applying that interpretation to "current year," the Board concluded that plaintiff, defendant Arlington, defendant Balmoral, defendant Maywood, and defendant Fairmount remained eligible to receive a prorated portion of the protest fund because they were organization licensees in 2009, the year of proposed distribution. However, because National did not have a license after 2006, the Board concluded that National was not eligible to receive distributions from the protest fund, finding the legislative purpose of the Racing Act would be frustrated if an out-of-business licensee received funds designed to improve and grow the horse-racing industry. Because defendant Fairmount qualified for distributions under section 54.5(b)(2)(A) of the Racing Act, the Board found Fairmount could not receive additional distributions under section 54.5(b)(2)(B). See 230 ILCS 5/54.5(b)(2)(A), (b)(2)(B) (West 2006).

¶ 9        Moreover, in its July 8, 2009, memorandum, the Board addressed the *pro rata* distribution of the protest fund "according to the aggregate proportion of total handle from

wagering on live races conducted in Illinois *** for calendar years 2004 and 2005." 230 ILCS 5/54.5(b)(2)(B) (West 2006). The Board concluded that the language was ambiguous where the statute could be construed to include only the "total handle" of eligible organization licensees or the "total handle" of all live racing in the state, in which two "subordinate licensees" that operated live racing at facilities at which they did not have the majority of operating control would be included in the calculation of "total handle." In other words, the subordinate licensees, *i.e.*, Suburban Downs, Inc. (Suburban), and Associates Racing Association (Associates), which operated race meetings out of the Hawthorne facility and Maywood facility, respectively, would also be included in the "total handle." The Board concluded that the "aggregate handle" should logically combine the 2004 and 2005 handles of the subordinate licensees with the handles of the organization licensees with majority operating control at their particular facilities, *i.e.*, Suburban with Hawthorne and Associates with Maywood.

¶ 10    With that application of "total handle" in mind, in its memorandum, the Board then considered whether National qualified as a subordinate licensee with the ability to combine its handle with that of Hawthorne, where it had held races in 2006. The Board ultimately concluded that National was not a subordinate licensee in the same manner as Suburban and Associates because, if the money had been distributed in 2006, National had the ability to obtain a proportion of the protest fund on its own due to having had a majority operating control of a live racing facility in 2002 and being an organization licensee in 2006. In contrast, Suburban and Associates never held a majority operating control of a racing facility in 2002; thus, Suburban and Associates never established eligibility.

¶ 11    Applying language found in section 54.5(b)(2) of the Racing Act, the Board, however, determined that National then became ineligible to receive money from the protest fund because it was no longer an organization licensee in the "current year" of 2009, the year of distribution. 230 ILCS 5/54.5(b)(2) (West 2006). As a result, pursuant to the last sentence of section 54.5(b)(2), the Board determined that National's handle should be redistributed among the remaining eligible receivers in proportion to their qualifying percentages.

¶ 12    On July 14, 2009, the Board held a meeting and adopted the recommendation provided in the memorandum.

¶ 13    Arlington disagreed with the Board's conclusion crediting Suburban's handle to Hawthorne and Associates' handle to Maywood, and sought administrative review. The circuit court affirmed the Board's decision. Arlington appealed. On May 29, 2012, this court affirmed the Board's interpretation of the ambiguous statutory language directing distributions of the protest fund "pro rata according to the aggregate proportion of total handle from wagering on live races conducted in Illinois." *Arlington Park Racecourse LLC v. Illinois Racing Board*, 2012 IL App (1st) 103743, ¶¶ 42-47. In so doing, this court gave deference to the Board as an agency, relying on its industry expertise, and considered the purpose of the statute, namely, to provide monetary assistance to active participants in the horse-racing industry to offset the negative impact of riverboat casinos. *Id.*

¶ 14    Meanwhile, in April 2010, upon learning that the Board intended to distribute the Fund as extended by the 2008 statute, plaintiff sent a letter to the Board requesting a hearing and

arguing that National's 2004-05 handle should not be redistributed in the same manner as it was under the 2006 statute. Rather, plaintiff argued that National was never eligible to receive distributions under the 2008 statute and, therefore, National's portion of the 2004-05 aggregate handle should be credited to Hawthorne, similar to the crediting of subordinate licensees Suburban and Associates under the 2006 statute, because National raced at Hawthorne's facility in 2006, but was not an organization licensee at the relevant time. On May 4, 2010, Board Chairman James Sinopoli responded to plaintiff's letter by refusing to hold a hearing and rejecting plaintiff's objection to the redistribution of National's handle to the remaining eligible organization licensees. On May 6, 2010, plaintiff sent a responsive letter further advocating its position. Then, on May 7, 2010, the Board issued a distribution order for the Fund pursuant to the 2008 statute. In that order, the Board distributed the money from the Fund according to the same percentages as the distributions made in 2009 pursuant to the 2006 statute. Of relevance to this case, the Board again treated National as a former licensee with majority operating control of a live racing facility in 2002 that then became ineligible by failing to hold a license in 2010, the year of distribution, and, therefore, its handle was redistributed among eligible licensees based on their respective proportions.

¶ 15    Hawthorne filed a complaint for administrative review. The Board and defendant Arlington filed motions to dismiss, arguing the circuit court lacked subject matter jurisdiction where plaintiff failed to timely appeal the Board's July 14, 2009, administrative decision and where the agency's May 7, 2010, notification that it planned to continue making payments in accordance with its prior administrative decision did not represent a new decision subject to administrative review. On December 8, 2010, the circuit court denied the motions to dismiss for "reasons stated on the record." To our knowledge, no transcript from the hearing on that date appears in the record.

¶ 16    On administrative review, the central dispute between the parties concerned the interpretation of the statutory language "current year" and its application in terms of eligibility to receive distributions from the Fund pursuant to the 2008 statute, *i.e.*, section 54.75(b)(2) of the Racing Act (230 ILCS 5/54.75(b)(2) (West 2010)). Plaintiff argued that, although the language of the 2006 and 2008 statutes was identical, the facts differed as applied to each statute and thus alternate results were required. More specifically, plaintiff argued that, in order to be eligible for distributions, an entity must have held majority operating control of a live racing facility in 2002 *and* must hold a license in the "current year." Plaintiff maintained that the Board interpreted "current year" to mean year of enactment in relation to the 2006 statute, and such application to the 2008 statute prohibited National from establishing eligibility because it did not hold an organization license in 2008. As a result, according to plaintiff, National's handle should not have been redistributed where National could not become ineligible because it never established eligibility to begin with. In opposition, the Board argued that "current year" was consistently interpreted with both statutes to mean year of Fund distribution. The Board further argued that National established eligibility to receive funds because it was an organization licensee with majority operating control of a live racing facility in 2002, and then became ineligible when it was no longer a licensee in the year of distribution.

¶ 17    On May 25, 2011, in a written order, the circuit court affirmed the Board's decision,

finding the Board consistently interpreted the "current year" language to mean year of distribution and that the statute fixed the original year of eligibility to 2002 with the change of status to "become ineligible" as failing to remain a licensee in the "current year." This appeal followed.

¶ 18                                            DECISION

¶ 19                                          I. Jurisdiction

¶ 20    Defendant Arlington initially argues that we do not have jurisdiction to consider plaintiff's appeal because the circuit court lacked subject matter jurisdiction over plaintiff's complaint for administrative appeal. We note that the Board does not challenge this court's jurisdiction and, in oral arguments, asserted a "neutral" position on the question of the circuit court's subject matter jurisdiction. Arlington, however, contends the circuit court did not have subject matter jurisdiction where plaintiff failed to file an appeal within 35 days of the Board's July 14, 2009, final administrative decision, as required by sections 3-102 and 3-103 of the Code of Civil Procedure (Administrative Review Law) (735 ILCS 5/3-102, 3-103 (West 2008)). Plaintiff responds that the Board's July 14, 2009, decision was limited to the interpretation of the 2006 statute, and plaintiff timely filed an appeal of the Board's May 4, 2010, and May 7, 2010, decisions which interpreted the 2008 statute.

¶ 21    "The failure to commence an administrative review action, where required, is jurisdictional, and the circuit court will have no subject matter jurisdiction to act. [Citation.] The lack of subject matter jurisdiction cannot be waived, and without it, the trial court has no authority to consider or act on a case before it other than to dismiss it. [Citation.]" *Mandeville v. Trucano*, 225 Ill. App. 3d 505, 508 (1992). Section 3-102 of the Administrative Review Law provides that "[u]nless review is sought of an administrative decision within the time and in the manner herein provided, the parties to the proceeding before the administrative agency shall be barred from obtaining judicial review of such administrative decision."[2] 735 ILCS 5/3-102 (West 2008). Section 3-103 of the Administrative Review Law provides that a final administrative decision may be reviewed if a complaint is filed and a summons is issued within 35 days from the date the affected party receives a copy of the decision at issue. 735 ILCS 5/3-103 (West 2008).

¶ 22    There is no question that plaintiff did not seek review of the Board's July 14, 2009, decision within 35 days of its issuance. The question before us, therefore, is whether the Board's May 4, 2010, letter and May 7, 2010, notification were final administrative decisions providing a new 35-day period in which to seek review. We note that the circuit court's opinion does not address the jurisdictional question. Based on our review of the record, we conclude the May 4, 2010, letter and the May 7, 2010, notification were final administrative decisions. The Board's conclusion, in its May 4, 2010, response letter to plaintiff's counsel, that the language of the 2008 statute was to be construed in the same manner as the language of the 2006 statute provided the Board's final decision on that issue. The May 4, 2010,

_____

[2]Section 46 of the Racing Act expressly adopted the provisions of the Administrative Review Law for purposes of reviewing a Board decision. 230 ILCS 5/46 (West 2008).

response letter rejected plaintiff's request for a hearing regarding the application of the language of the 2008 statute and instructed that the Fund distributions would be made on or before May 7, 2010, in accordance with the 2008 statute. Moreover, the Board's May 7, 2010, notification provided a breakdown of the money to be distributed pursuant to the 2008 statute. Prior to that notification, the Board had only established the breakdown of the money distributed pursuant to the 2006 statute. Section 3-101 of the Administrative Review Law provides that an "administrative decision" is "any decision, order or determination of any administrative agency rendered in a particular case, which affects the legal rights, duties or privileges of parties and which terminates the proceedings before the administrative agency." 735 ILCS 5/3-101 (West 2008). The Board's May 4, 2010, letter and May 7, 2010, notification affected plaintiff's rights to the Fund and terminated the proceedings related to the interpretation of the 2008 statute.

¶ 23        Prior to the Board's issuance of the letter and notification, the distribution of funds as related to the 2008 statute had not been established. Our review of the Board's July 8, 2009, memorandum, which was ultimately adopted on July 14, 2009, as well as the minutes from the July 14, 2009, hearing demonstrates that the Board was concerned with the rights of the horse-racing entities as related to the *2006 statute*. We recognize that the July 8, 2009, memorandum referenced section 54.75 of the Racing Act, which is the 2008 statute, and the Board's executive director mentioned section 54.75 at the July 14, 2009, hearing; however, our review of those references to the 2008 statute demonstrates that the references were misnomers and the context of the discussions focused on the 2006 statute, not the 2008 statute.

¶ 24        We, therefore, conclude that plaintiff's complaint, filed on June 8, 2010, for administrative review of the Board's May 4, 2010, letter and May 7, 2010, notification complied with the 35-day period required under the Administrative Review Law. As a result, the circuit court had subject matter jurisdiction to consider the complaint and we have jurisdiction to consider plaintiff's timely filed appeal from that decision.

¶ 25                              II. Interpretation of the 2008 Statute

¶ 26        Plaintiff contends the Board erred in interpreting subsection (b)(2) of the 2008 statute as requiring redistribution of National's handle in the same fashion as in conjunction with the 2006 statute. Plaintiff argues that the Board inconsistently applied the language of the 2006 and 2008 statutes where it concluded that the language "current year" in the 2006 statute applied to the year of the statute's enactment whereas it concluded that the same language in the 2008 statute applied to the year of the distribution of the money. According to plaintiff, the appropriate interpretation and application of the language of the 2008 statute requires National's handle to be combined with its own.

¶ 27        When an appeal is taken from a circuit court's entry of judgment on administrative review, we review the decision of the administrative agency and not the judgment of the circuit court. *AT&T Teleholdings, Inc. v. Department of Revenue*, 2012 IL App (1st) 110493, ¶ 13. In cases involving statutory interpretation, the primary goal is to ascertain and give effect to the intent of the legislature by looking to the language of the statute and applying

its plain and ordinary meaning. *Hadley v. Illinois Department of Corrections*, 224 Ill. 2d 365, 371 (2007). When the statutory language is clear and unambiguous, the words are given effect without resorting to other construction aids. *Id*. Where an agency has been charged with a statute's administration and enforcement, a court will not substitute its own construction of a statutory provision where the agency has provided a reasonable interpretation. *Id*. Moreover, courts defer to the agency's interpretation of any statutory ambiguities. *Id*. at 370. However, courts are not bound by an agency's interpretation that conflicts with the statute, is unreasonable, or is otherwise erroneous. *Id*. at 371.

¶ 28 As previously stated, plaintiff argues that the Board erroneously applied the same statutory language, namely, "current year," in two different ways for the 2006 statute and the 2008 statute. The record, however, disputes plaintiff's contention. As we concluded above, the Board's May 4, 2010, letter and May 7, 2010, notification were administrative decisions regarding the interpretation and application of the 2008 statute; however, the Board concluded that the 2008 statute required the same interpretation as the 2006 statute and, therefore, the distributions from the Fund were identical as those made pursuant to the 2006 statute. As a result, we must review the Board's conclusion regarding the disputed language in the 2006 statute.

¶ 29 After reviewing the Board's July 8, 2009, memorandum and the transcript from the July 14, 2009, hearing, it is clear that the Board interpreted the language "current year" in the 2006 statute as meaning the year of distribution. Moreover, the Board consistently interpreted the disputed language in the 2008 statute.

¶ 30 Plaintiff misinterprets the Board's construction and application of the language based on an example the Board used to demonstrate National's potential eligibility. More specifically, in its memorandum, the Board provided that, had a distribution been made in 2006, National would have been eligible to receive money because it held an organization license in 2006 and had majority operating control of a live racing facility in 2002. The Board went on to explain that, since the distribution was being made in 2009 and National no longer held an organization license in that year, it had become ineligible to receive distributions and its handle, therefore, needed to be redistributed among the remaining eligible recipients. Plaintiff assumed, based on the use of 2006 as an exemplary year, that the Board interpreted "current year" to mean the year of enactment, *i.e.*, 2006 for the 2006 statute, and that National's eligibility was established because it held an organization license in the year the 2006 statute was enacted and had majority operating control of a live racing facility in 2002. Plaintiff maintains that "current year" must be equally defined as the year of enactment for purposes of the 2008 statute, which would necessarily prohibit National from establishing eligibility because it did not hold an organization license in 2008. Plaintiff's assessment and application of "current year" are misinformed.

¶ 31 Instead, we find the Board's interpretation of "current year" to be reasonable. We conclude that interpreting "current year" to mean year of the statute's enactment could lead to absurd results where such an interpretation would allow a person that is no longer active in the horse-racing industry to obtain money from the Fund simply because that person held a majority operating control of a facility in 2002 and an organization license in 2008. Such

an interpretation does not support the purpose of the statute, *i.e.*, to provide continued support to the horse-racing industry. Rather, applying the definition of year of distribution to the "current year" language ensures that the entities receiving distributions from the Fund are active participants in the improvement and growth of the horse-racing industry.

¶ 32  The parties additionally dispute the statute's requirements for establishing eligibility for Fund distributions.

¶ 33  Plaintiff contends that, in order to establish eligibility, the statute requires that a person hold a majority operating control of a live racing facility in 2002 *and* hold an organization license in the current year. Plaintiff maintains that, no matter what definition is applied to "current year," National cannot establish eligibility because it was not an organization licensee in 2008, the year of enactment, or 2010, the year of distribution. Because eligibility could not be established, plaintiff argues that National could not become ineligible and, therefore, its 2004-05 handle should not have been subject to redistribution.

¶ 34  In contrast, the Board argues that eligibility is established pursuant to subsection 54.75(b)(2)(B)(i) of the Racing Act where a person held majority operating control of a live racing facility in 2002. The Board considers this to be the "fixed criteria" for establishing eligibility. The Board interprets the additional element listed in subsection (b)(2)(B)(ii) as the legislature's method of defining ineligibility, in that an entity that had been an organization licensee with majority operating control of a live racing facility in 2002 would become ineligible to receive distributions from the Fund if the entity was no longer an organization licensee in the "current year" or year of distribution.

¶ 35  For resolution of this issue, we must apply the general tenants of statutory interpretation by looking to the plain language of the entire statute, as a whole. *Hadley*, 224 Ill. 2d at 371. Turning to the last portion of subsection (b)(2)(B) of the Racing Act, the statute provides that "[i]f any person identified in this paragraph (2) *becomes ineligible* to receive moneys from the Fund, such amount shall be redistributed among the remaining persons in proportion to their percentages otherwise calculated." (Emphasis added.) 230 ILCS 5/54.75(b)(2)(B) (West 2010). The plain language of the term "becomes ineligible" inherently requires that a person who was once eligible is no longer eligible. See Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/become (defining become as "to come into existence," "to come to be," or "to undergo change or development"). However, we determine that the statute's definition of eligible is ambiguous where the language is susceptible to more than one interpretation. *People ex rel. Birkett v. City of Chicago*, 202 Ill. 2d 36, 46 (2002). In situations such as these, our supreme court has advised that "a reasonable construction of an ambiguous statute by the agency charged with that statute's enforcement, if contemporaneous, consistent, long-continued, and in concurrence with legislative acquiescence, creates a presumption of correctness that is only slightly less persuasive than a judicial construction of the same act." *Id*.

¶ 36  We find the Board's interpretation of "becomes ineligible" to be reasonable and contemporaneous, consistent and continued from its interpretation of the same language in the 2006 statute, and in concurrence with legislative acquiescence where the legislature has not amended the statute to reflect a contrary interpretation. Moreover, in ascertaining the

legislature's intent, we defer to the Board's experience and expertise as the agency charged with administering the Racing Act. *Arlington Park Racecourse LLC*, 2012 IL App (1st) 103743, ¶ 37 (citing *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d 142, 152 (1983)).

¶ 37    On the other hand, plaintiff's interpretation of eligibility, namely, holding majority control of a live racing facility in 2002 and having a license in the current year, does not provide an express means for an entity to "become ineligible." Rather, the challenged language would require guesswork as to what circumstances could lead to ineligibility. See *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012, ¶ 56 (courts should not depart from the plain language of a statute by "reading into it exceptions, limitations, or conditions that conflict with the expressed intent of the legislature"). In contrast, the Board's interpretation of eligibility supports the spirit of the statute, in that an organization licensee that held majority operating control of a live racing facility in 2002 would remain eligible for fund distribution so long as it remained active in the industry by maintaining an organization license at the time the distribution was to be made.

¶ 38    We, therefore, conclude that National was initially eligible to receive a distribution from the Fund because it held majority operating control of a live racing facility in 2002; however, because National was not an organization licensee in 2010, the current year of distribution, it became ineligible. As a result, the Board properly found that the final sentence of subsection (b)(2)(B) of the Racing Act required that National's proportion of the aggregate handle generated from its live races in 2004 and 2005 be redistributed, *pro rata*, among the remaining entities eligible to receive distributions.

¶ 39                                   CONCLUSION

¶ 40    We affirm the Board's May 4, 2010, and May 7, 2010, decisions.

¶ 41    Although not challenged by the parties in the instant appeal, as a point of clarification, we additionally instruct the Board to determine whether any state fairs are eligible for distributions under the 2008 statute for having participated in the "total handle" of all live racing in the state, similar to this court's prior decision in *Arlington Park Racecourse LLC v. Illinois Racing Board*, 2012 IL App (1st) 103743, ¶¶ 56-58.

¶ 42    Affirmed.