# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*Arlington Park Racecourse LLC v. Illinois Racing Board*, 2012 IL App (1st) 103743

| | |
|---|---|
| Appellate Court Caption | ARLINGTON PARK RACECOURSE LLC, Plaintiff-Appellant, v. ILLINOIS RACING BOARD; JOSEPH J. SINOPOLI, as Chairman and Not Individually; DENNIS S. BOOKSHESTER, JOSEPH N. CASCIATO, W. JACK CHAMBLIN, ANGELO CIAMBRONE, WILLIAM H. FARLEY, TIMOTHY P. MARTIN, JONATHAN P. METCALF, MICHAEL E. MURPHY, PAUL B. SMITH, ROBERT C. WINCHESTER and MARC LIANO, as Members and Not Individually; HAWTHORNE RACECOURSE, INC.; MAYWOOD PARK TROTTING ASSOCIATION, INC.; BALMORAL RACING CLUB, INC.; AND FAIRMOUNT PARK, INC., Defendants-Appellees. |
| District & No. | First District, First Division<br>Docket No. 1-10-3743 |
| Rule 23 Order filed | April 23, 2012 |
| Rule 23 Order withdrawn | May 25, 2012 |
| Opinion filed | May 29, 2012 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The decision of the Illinois Racing Board with regard to the calculation of distributions from the Horse Racing Equity Trust Fund to organization licensees under the Illinois Horse Racing Act of 1975 was affirmed with the exception of the Board's failure to include the handle generated by the state fairs and the concomitant share of the Fund monies state fairs should receive in its calculation, since section 54.5(b)(2)(B) of the Act is ambiguous, there were arguments supporting the interpretations of both the Board and plaintiff, and the Board's interpretation, including its decision that the handle generated by an ineligible licensee at a track operated by an eligible licensee should be including in calculating distributions to the eligible licensee, was entitled to deference based on the Board's experience and expertise. |

| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CH-28774; the Hon. Nancy J. Arnold, Judge, presiding. |
| --- | --- |
| Judgment | Affirmed in part and reversed in part. |
| Counsel on Appeal | Seyfarth Shaw LLP, of Chicago (P. Shawn Wood and Marcus L. Mintz, of counsel), for appellant. |
| | Richard J. Prendergast, Ltd., of Chicago (Richard J. Prendergast and Michael T. Layden, of counsel), for appellee Hawthorne Race Course, Inc. |
| | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Richard S. Huszagh, Assistant Attorney General, of counsel), for other appellees. |
| Panel | JUSTICE KARNEZIS delivered the judgment of the court, with opinion. Presiding Justice Hoffman and Justice Hall concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff Arlington Park Racecourse LLC appeals from an order of the circuit court affirming the administrative decision of defendant Illinois Racing Board (the Board) regarding the calculation of distributions from the Horse Racing Equity Trust Fund to organization licensees under the Illinois Horse Racing Act of 1975 (the Racing Act) (230 ILCS 5/1 *et seq.* (West 2006)). Plaintiff argues the Board's interpretation of the distribution calculation found in section 54.5(b)(2)(B) of the Racing Act (230 ILCS 5/54.5(b)(2)(B) (West 2006)) improperly bolstered distribution shares to defendants Hawthorne Race Course, Inc. (Hawthorne), and Maywood Trotting Association, Inc. (Maywood), to plaintiff's detriment. We affirm in part and reverse in part.

¶ 2                                    Background

¶ 3    Being of the opinion that riverboat gaming casinos in Illinois have had a negative impact on Illinois's horse racing industry, the Illinois legislature determined that monetary assistance to the horse racing industry was in order to offset the negative impact. To that end, effective

May 26, 2006, the General Assembly passed Public Act 94-804. Under this legislation, casinos with an adjusted gross receipts over $200 million had to deposit 3% of their adjusted gross receipts daily into the newly created Horse Racing Equity Trust Fund (the Fund) for a period of two years, from May 26, 2006, to May 26, 2008. Pub. Act 94-804, § 15 (eff. May 26, 2006); 230 ILCS 10/7 (West 2006).

¶ 4   Pursuant to section 54.5 of the Racing Act, the Fund was to be administered by the Illinois Racing Board, with 60% of the monies in the Fund to be distributed as purses at races and the remaining 40% to qualifying organization licensees to be used for the improvement, maintenance, marketing and operation of their racing facilities.[1] Pub. Act 94-804, § 10 (eff. May 26, 2006); 230 ILCS 5/54.5(a), (b)(2)(B) (West 2006). The monies were to be distributed from the Fund within 10 days of deposit into the Fund. 230 ILCS 5/54.5(b) (West 2006).

¶ 5   The four casinos subject to the legislation filed suit in the circuit court of Will County against the Board and the State Treasurer, asserting the legislation was unconstitutional. They paid the mandated 3% of their revenue into a protest fund rather than into the Fund. In June 2008, the Illinois Supreme Court rejected the casinos' claims, finding Public Act 94-804 was constitutional. *Empress Casino Joliet Corp. v. Giannoulias*, 231 Ill. 2d 62 (2008), *cert. denied*, ___ U.S. ___, 129 S. Ct. 2764 (2009). The monies in the protest fund were then transferred into the Fund and it was for the Board to determine distribution of the monies. To that end, in June 2009, the Board requested position papers from interested parties regarding how the Fund monies deposited pursuant to Public Act 94-804 should be distributed.

¶ 6   Meanwhile, on May 26, 2008, section 54.5 had expired by its own terms after two years. However, the legislature reenacted the provisions of Public Act 04-804 for a period of three years by passing Public Act 95-1008, effective December 15, 2008. Pub. Act 95-1008, § 1 (eff. Dec. 15, 2008). The legislation added section 54.75 to the Racing Act to replace the former section 54.5. Pub. Act 95-1008, § 1 (eff. Dec. 15, 2008). Section 54.75 had essentially the same language as section 54.5. 230 ILCS 5/54.75 (West 2008); 230 ILCS 5/54.5 (West 2006).

¶ 7   The Board scheduled a meeting to determine how, pursuant to section 54.5, the monies in the Fund should be distributed. Hawthorne, Arlington, Maywood and Balmoral submitted position papers in advance of the meeting. The Board's general counsel submitted a memorandum with staff recommendations (staff memorandum) regarding the distributions. On July 14, 2009, the Board adopted the recommendations in the staff memorandum and approved the percentages of distribution in that memorandum.

¶ 8   Relevant here is the Board's interpretation of section 54.5(b)(2)(B) regarding how the 40% of the Fund intended for the improvement, maintenance and marketing of racing

---

[1]The Racing Act defines an organization licensee as "any person receiving an organization license from the Board to conduct a race meeting or meetings." 230 ILCS 5/3.11 (West 2008).

facilities should be distributed.[2] There was no question that 11% of that 40% would go to organization licensee Fairmount Park, Inc., pursuant to section 54.5(b)(2)(A). The question was how the following language in section 54.5(b)(2)(B) regarding the remaining 89% of the 40% should be interpreted:

> "(B) the remaining 89% shall be distributed pro rata according to the aggregate proportion of total handle from wagering on live races conducted in Illinois (irrespective of where the wagers are placed) for calendar years 2004 and 2005 to any person (or its successors or assigns) who (i) had majority operating control of a racing facility at which live racing was conducted in calendar year 2002, (ii) is a licensee in the current year, and (iii) is not eligible to receive monies under subparagraph (A) of this paragraph (2).
>     ***
> If any person identified in this paragraph (2) becomes ineligible to receive moneys from the Fund, such amount shall be redistributed among the remaining persons in proportion to their percentages otherwise calculated."[3] 230 ILCS 5/54.5(b)(2) (West 2006).

¶ 9    The staff memorandum looked first to which organization licensees qualified for distributions under section 54.5(b)(2)(B). At the time Public Act 04-804 was enacted in 2006, National Jockey Club (NJC) met the requirements for distribution under section 54.5(b)(2)(B) because (i) it had majority operating control of a racing facility at which live racing was conducted in calendar year 2002; (ii) was a licensee in 2006; and (iii) was not eligible for distribution under subsection (b)(2)(A). However, by the time the Board was ready to make the distributions in 2009, NJC was no longer a licensee. Therefore, the staff found NJC not eligible to receive a share of the funds because it no longer met the requirements of section 54.5(b)(2)(B)(ii).

¶ 10    The staff interpreted the "licensee in the current year" requirement in section 54.5(b)(2)(B)(ii) to mean that the distribution was intended for those who were organization licensees in the year of distribution, and NJC did not qualify as such in 2009. The staff explained that, reading "current year" to mean based on each year the law was in operation, *i.e.*, based on licensure in 2006, 2007 and 2008, would result in a 2009 distribution to an out-of-business former licensee that no longer conducted live races. Reading the "current year" in context with the provision that "[i]f any person identified in this paragraph (2) becomes ineligible to receive moneys from the Fund, such amount shall be redistributed among the remaining persons in proportion to their percentages otherwise calculated" (230 ILCS

---

[2]The 40% of the Fund remaining after 60% of the Fund has been distributed for purses.

[3]Title 11 of the Illinois Administrative Code defines "handle" as the "aggregate dollar amount of all pari-mutuel pools, excluding refundable wagers." 11 Ill. Adm. Code 210.10 (2012). It defines "pari-mutuel system" as the "manual, electro-mechanical, or computerized system and all software (including the totalizator, account betting system and off-site betting equipment) that is used to record wagers and transmit wagering data." 11 Ill. Adm. Code 210.10 (2012).

5/54.5(b)(2) (West 2006)), the staff found it clear that the legislature did not intend for nonoperating licensees to receive funds. NJC was no longer eligible for a distribution.

¶ 11   Consistent with its interpretation of "current year," the staff memorandum recommended that, of the organization licensees conducting races in 2004 and 2005, only four met the requirements for distribution stated in section 54.5(b)(2)(B): Arlington, Hawthorne, Maywood and Balmoral. Each was eligible for distribution because each (i) had majority operating control of a racing facility at which live racing was conducted in calendar year 2002; (ii) was a licensee in the "current year," *i.e.*, 2009; and (iii) was not eligible to receive monies under subparagraph (A) of section 54.5(b)(2).

¶ 12   Although Fairmount met the requirements of sections 54.5(b)(2)(B)(i) and (ii), it already qualified for the 11% distribution under section 54.5(b)(2)(A). Therefore, pursuant to section 54.5(b)(2)(B)(iii), it could not also receive a distribution under section 54.5(b)(2)(B).

¶ 13   The staff memorandum then examined the section 54.5(b)(2)(B) requirement that the 89% "shall be distributed pro rata according to the aggregate proportion of total handle from wagering on live races conducted in Illinois (irrespective of where the wagers are placed) for calendar years 2004 and 2005." 230 ILCS 5/54.5(b)(2)(B) (West 2006). In determining the proportion of total handle attributed to each eligible licensee, it found an apparent ambiguity in the phrase "aggregate proportion of total handle from wagering on live races" because it could be limited to just the wagering on the eligible organization licensees' live races. The staff found the statute "seem[ed] to be written in that manner" because the statute did not provide that the shares were to be determined based on the aggregate total of 2004 and 2005 handle from all organization licensees that operated at a racetrack.

¶ 14   In section 54 of the Act, the legislature directed how the distribution of moneys from the "Horse Racing Equity Fund," a fund entirely separate from the Horse Racing Equity Trust Fund at issue here, should be made. The legislature stated the moneys from that fund were to be "distributed pro rata according to the aggregate proportion of state-wide handle at the *racetrack*, inter-track, and inter-track wagering locations." (Emphasis added.) 230 ILCS 5/54(b)(2) (West 2006). The Board's staff found that if the legislature had intended that the total handle of all organization licensees operating at the same racetrack be included in the calculation of the section 54.75 proportion, it had the "racetrack" language to do so available in the immediately preceding section of the Racing Act.

¶ 15   However, the staff found this interpretation of the phrase "aggregate proportion of total handle from wagering on live races," which limited "total handle" to include only the 2004-05 handle of eligible stakeholders in the Fund, to be inadequate. It found that, "logically[,] 'total handle' [was] intended to include the handle of *all* live racing in the state." (Emphasis in original.) The problem was that there were two organization licensees who generated handle in 2004 and 2005 that were not eligible for distributions under the statute. In 2004 and 2005, Suburban Downs, Inc. (Suburban), generated handle operating a meet at the Hawthorne facility and Associates Racing Association (Associates) generated handle at the Maywood facility. However, because neither Suburban nor Associates held majority operating control of a racing facility in 2002, neither was eligible for a distribution under section 54.5(b)(2)(B).

¶ 16    Since "total handle" meant all handle, if an eligible licensee was to receive its share based on the proportion of the handle it generated to *all* handle generated, the proportion of handle generated by Suburban and Associates would not be accounted for. The staff questioned what should be done with the proportion generated by "subordinate licensees" Suburban and Associates. It recommended that the logical course was to include "subordinate licensee" handle with the handle of the organization licensee with the majority operating control at the facility at which the subordinate licensee's handle was generated. So, because Suburban's races were run at Hawthorne's track and Associates' races were run at Maywood's track, Suburban's handle would be combined with Hawthorne's handle and Associate's handle would be combined with Maywood's handle. The staff reported that "[i]n that way, total handle is accounted for and attributed to eligible stakeholders in the Fund."

¶ 17    In 2004 and 2005, NJC generated handle from races run at Hawthorne's track. However, under the staff's interpretation of section 54.5, NJC's 2004 and 2005 handle would not be attributed to Hawthorne. In 2006 when the legislation was passed, NJC was eligible for a distribution from the Fund in its own right because it was a licensee in that year and had majority operating control of a racing facility, Sportsman's Park, in 2002. If the money had been distributed from the Fund in 2006, NJC would have received a share based on the aggregate proportion of handle it generated from its own live races in 2004 and 2005. If NJC still had held licensee status in the "current year," 2009, the year of distribution, it would have received the same share. However, in 2009 NJC no longer existed as an organization licensee. The staff, therefore, determined that NJC's handle had to fall under the section 54.5(b)(2)(B) provision stating that, if any person becomes ineligible to receive monies from the Fund, its share was to be redistributed among the remaining persons to its percentage otherwise calculated. That share could not go to Hawthorne.

¶ 18    The staff recommended that the distribution from the Fund be as follows:

| Fairmount | 11% | $3,365,507.02 |
|---|---|---|
| Arlington | 33.8003% | $10,341,384.73 |
| Hawthorne | 22.4059% | $6,855,210.28 (incl. Suburban's percentage) |
| Balmoral/Maywood | 32.7937% | $10,033,416.30 (Balmoral and Maywood are jointly owned; incl. Associates' percentage). |

The Board adopted this recommendation.

¶ 19    Arlington filed a complaint for administrative review of the Board's decision with the circuit court of Cook County against the Board, Hawthorne, Maywood, Balmoral and Fairmount. It contested only the portion of the Board's decision crediting Suburban's handle to Hawthorne and Associates' handle to Maywood for purposes of calculating the Fund distribution shares under section 54.5.

¶ 20    The court affirmed the Board's decision. The court found the distribution provision ambiguous and that it was for the Board, applying its expertise regarding horse racing, to resolve the ambiguity. It found the Board's interpretation of the statute supportable given the statute's focus on the improvement of "live racing facilities."

¶ 21    Plaintiff timely appealed from the court's order. On appeal, it again contests only that

portion of the Board's decision crediting Suburban's handle to Hawthorne and Associates' handle to Maywood for purposes of calculating the Fund distribution shares under section 54.5.

¶ 22     We recognize that section 54.5 of the Racing Act has been repealed due to expiration of its two-year effective period and has been replaced by section 54.75. Because the issue before us initially concerned the Board's interpretation of section 54.5, we will refer to section 54.5. However, our analysis applies equally to section 54.75. The language in section 54.75 is essentially the same as the language in section 54.5. The only relevant difference is that section 54.5 applies to monies deposited into the Fund during the two-year period set forth in Public Act 94-804 (May 26, 2006, to May 26, 2008), while section 54.75 applies to monies deposited into the Fund during the three-year period set forth in Public Act 95-1008 (December 15, 2008, to December 15, 2011). Although section 54.75 expired by its own terms on December 15, 2011, distribution of the monies the casinos deposited into the Fund during that three-year period is still to be made pursuant to the distribution calculation in section 54.75.

¶ 23                                    Analysis

¶ 24                              Standard of Review

¶ 25     Plaintiff appeals from the court's order affirming that portion of the Board's decision crediting Suburban's and Associates' handles to Hawthorne and Maywood, respectively, for purposes of calculating the Fund distribution shares. The Board and Hawthorne have each filed a brief in response.

¶ 26     In an administrative review case such as the case at bar, we review the decision of the agency, here the Board, not that of the trial court. *Krocka v. Police Board*, 327 Ill. App. 3d 36, 46 (2001). Our function is the same as that of the trial court, "namely, to determine, based on a review of the record that was before the administrative agency, whether the agency's findings and orders are against the manifest weight of the evidence or whether the agency acted arbitrarily, without cause, or in clear abuse of its discretion." *North Avenue Properties, L.L.C. v. Zoning Board of Appeals*, 312 Ill. App. 3d 182, 184 (2000); 735 ILCS 5/3-110 (West 1998).

¶ 27     An agency's findings of fact are considered *prima facie* true and correct and will not be disturbed unless they are contrary to the manifest weight of the evidence, *i.e.,* if all reasonable people would agree that the finding is erroneous and that the opposite conclusion clearly evident. *North Avenue Properties, L.L.C.*, 312 Ill. App. 3d at 184; *Chicago Title & Trust Co. v. Village of Inverness*, 315 Ill. App. 3d 1100, 1103 (2000). The Board's findings of fact are uncontested here. Instead, the issue is the Board's interpretation of section 54.5(b)(2)(B) of the Racing Act, a statute. Construction of a statute is a question of law, which we review *de novo*. *North Avenue Properties, L.L.C.*, 312 Ill. App. 3d at 185.

¶ 28                              Section 54.5(b)(2)(B)

¶ 29     The parties do not contest the Board's interpretation of the eligibility requirements stated

in sections 54.5(b)(2)(B)(i), (ii) and (iii). They agree that Arlington, Hawthorne, Maywood and Balmoral qualify as organization licensees eligible to receive a distribution from the Fund under section 54.5(b)(2)(B). The point of contention is the calculation of that distribution, *i.e.*, the Board's interpretation of the statutory direction that distributions from the Fund are to be made to eligible organization licensees "pro rata according to the aggregate proportion of total handle from wagering on live races conducted in Illinois (irrespective of where the wagers are placed) for calendar years 2004 and 2005." 230 ILCS 5/54.5(b)(2)(B) (West 2006).

¶ 30    Plaintiff argues that the Board's decision to allow the handle of ineligible licensees Suburban and Associates to be included in the formula for calculating the respective shares of the four eligible licensees violates fundamental principles of statutory construction, is wholly unsupported by the statutory language of section 54.5(b)(2)(B) and must be reversed. Plaintiff argues the only reasonable interpretation of the legislation is that "aggregate proportion of total handle" must refer to the handle generated by those organization licensees that satisfy the eligibility requirements also stated in the same sentence.[4]

¶ 31    Paraphrasing plaintiff's argument, it asserts that distributions are to be made based on the following proportion: handle (wagering revenue) generated by an eligible licensee from live racing in Illinois divided by total of handle generated by all the eligible licensees from live racing in Illinois. In contrast, the Board used the following proportion: handle generated by an eligible licensee from live racing in Illinois plus any handle generated by ineligible licensees from live racing in Illinois for races run at a racetrack operated by that eligible licensee divided by total of all handle generated from live racing in Illinois.

¶ 32    Plaintiff asserts that the Board's interpretation of section 54.5(b)(2)(B) reads the phrase "aggregate proportion" out of the statute. "[T]otal handle from wagering on live racing in Illinois (irrespective of where the wagers are placed)" is modified by the immediately preceding "aggregate proportion." Plaintiff asserts the sentence as a whole, therefore, means that, in calculating a distributee's share of handle, each distributee may include handle from its own races generated both through wagers placed at the racetrack where the race(s) occurred and through wagers placed at other betting facilities. We agree that the proportion of handle of an eligible licensee includes handle generated from its races no matter where the wagering on those races took place. But we do not agree that this means "total handle" should be limited to only the handle generated by the eligible licensees or that "aggregate proportion of total handle" does not include handle generated by noneligible licensees.

¶ 33    We agree with the Board that "total handle from wagering on live races in Illinois" logically can be read only one way: to mean the handle from *all* live racing in Illinois. "Total," here an adjective modifying the noun "handle," commonly means "all." It is defined as "[w]hole; not divided; full; complete." Black's Law Dictionary 1498 (7th ed. 1999). The "handle from wagering on live races in Illinois" would not be "total," *i.e.*, "whole" or

---

[4]The first part of the section 54.5(b)(2)(B) sentence sets out the formula for determining the distribution shares and the second part of the sentence sets out the requirements for eligibility for such a distribution, *i.e.*, who should get a share.

"complete," if it did not include the handle from *all* racing in Illinois. It would not be "total" if it only included the handle generated by the four eligible licensees. Handle was generated in 2004 and 2005 by other, ineligible licensees. That handle must be included in the calculation if "total handle" is to be given its common and clearly understood meaning.

¶ 34    The adverb "pro rata" is defined as "[p]roportionately; according to an exact rate, measure, or interest." Black's Law Dictionary 1236 (7th ed. 1999).

¶ 35    The phrase "the aggregate proportion" has no common usage that this court, or the trial court for that matter, could discover. "Aggregate," an adjective modifying the noun "proportion," is defined as "[f]ormed by combining into a single whole or total." Black's Law Dictionary 66 (7th ed. 1999). The noun "proportion" is defined as "comparative relation between things; ratio." Random House Webster's Unabridged Dictionary 1551 (2d ed. 1998). So "the aggregate proportion" is apparently "the combination into a single whole/total of ratio" or some variation thereof.

¶ 36    Putting it all together, "pro rata according to aggregate proportion of total handle from wagering" appears to mean that each distributee will receive a share of the Fund "[proportionately] according to [the combination into a single whole/total of ratio] of [whole/complete] handle from wagering." It is impossible to glean from this instruction how exactly the *pro rata* distribution, the proportion of each eligible licensee's share, is to be determined. The instruction is confusing and certainly ambiguous. It appears to support both plaintiff's interpretation and the Board's interpretation.

¶ 37    Where a statute is ambiguous, we will give substantial deference and weight to the interpretation of the statute by the agency charged with administration and enforcement of that statute. *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d 142, 152 (1983). Although an agency's interpretation of its enabling statute and regulations is not binding on the court, the agency has the experience and expertise to make an informed judgment on what the legislature intended in enacting the statute and we will defer to that expertise. *Illinois Consolidated Telephone Co.*, 95 Ill. 2d at 152. "If the language of the statute permits two constructions, one of which would render the provision absurd and illogical and the other of which would render the provision reasonable and sensible, the former construction must be avoided." *County of Cook v. Illinois Labor Relations Board Local Panel*, 347 Ill. App. 3d 538, 547 (2004).

¶ 38    Here, the Board is the agency charged with administering the Racing Act and, more specifically, with making the distributions from the Fund. Therefore, in our interpretation of the statute, we will defer to the Board's years of experience and expertise administering the horse racing industry and the statute, as long as the Board's interpretation is reasonable and sensible.

¶ 39    It is clear, and the Board admits, that the Board's interpretation of the phrase has no direct support in the language of the statute. The statute does not expressly direct that handle generated by an ineligible licensee at a racetrack controlled by an eligible licensee should be added to the handle of that eligible licensee for purposes of calculating the distribution proportion. However, as stated above, "total handle" means "whole/complete handle." The "whole" handle comprises handle generated by the four eligible licensees and by Fairmount,

Suburban, Associates and a few state fairs. If "aggregate proportion of total handle" means only the proportion of handle generated by the eligible licensees, not all handle will be accounted for. As the Board asked: if distribution was only intended for eligible licensees, what should happen to the proportion of handle generated by ineligible licensees?

¶ 40 Some portion of "total handle" could be generated by a licensee who initially was eligible for a distribution under section 54.5(b)(2)(B) but became ineligible. Section 54.5(b)(2) provides for such an eventuality. It directs that, if "any person identified in this paragraph (2) becomes ineligible to receive moneys from the Fund, such amount shall be redistributed among the remaining persons in proportion to their percentages otherwise calculated." 230 ILCS 5/54.5(b)(2) (West 2006). As discussed previously, NJC is an example of an eligible licensee that became ineligible. NJC was eligible for a distribution in 2006 when the legislation was passed but, by the time of distribution in 2009, "the current year," it had lost its license and was no longer eligible. Therefore, pursuant to section 54.5(b)(2), because NJC was eligible but became ineligible by the time of distribution, the share of the Fund that it could have received is to be divided and distributed to the eligible licensees according to each eligible licensee's percentage share of the Fund. To accomplish this, the Board did not include NJC's handle in "total handle" in calculating the eligible licensees' shares of the Fund. This is the logical way to ensure that NJC's share of the Fund monies is distributed to all eligible licensees "in proportion to their percentages otherwise calculated" as required.

¶ 41 In contrast, Suburban and Associates did not "become ineligible" such that their shares were to be redistributed to the eligible licensees per section 54.5(b)(2). Although Suburban and Associates both generated handle from wagering on live racing in Illinois, neither ever met the eligibility requirements in section 54.5(b)(2)(B) because neither had majority operating control of a racing facility in 2002. Because they were never eligible for a distribution, they could not become ineligible such that section 54.5(b)(2) covered redistribution of their proportions.

¶ 42 Suburban generated approximately 5.9% of total handle from wagering on live racing in Illinois and Associates generated approximately 4.5% of total handle. Combined, they generated 10.4% of total handle. The statute does not specifically provide direction on how the proportion of handle generated by an ineligible licensee who had not "become ineligible" should be treated in calculating Fund distributions. Arguably, therefore, the combined 10.4% of handle generated by Suburban and Associates, which equates to an approximately 9.3% share of the section 54.5(b)(2)(B) Fund monies, or approximately $2.8 million, would remain undistributed.[5]

¶ 43 In enacting Public Act 94-804 to add section 54.5 to the Racing Act, the legislature found that "riverboat gaming has had a negative impact on horse racing" because from 1992, the first full year of riverboat gaming, through 2005, "Illinois on-track wagering has decreased

---

[5]The monies deposited into the Fund for 2006-08 totaled $76,488,795.82. Forty percent of the Fund remaining after the sixty percent distribution for purses is valued at $30,595,518.33. Eighty-nine percent of that forty percent is valued at $27,230,011.31. Suburban and Associates' approximately 10.9% share of that 89% is valued at $2,844,919.96.

by 42% from $835 million to $482 million." Pub. Act 94-804, § 1 (eff. May 26, 2006). The legislature stated the "decline of the Illinois horseracing and breeding program, a $2.5 billion industry, would be reversed" by enactment of the Act. Pub. Act 94-804, § 1 (eff. May 26, 2006). It found that the monies the casinos deposited into the Fund "will benefit that important [horse racing] industry for Illinois farmers, breeders, and fans of horse racing and will begin to address the negative impact riverboat gaming has had in Illinois horseracing." Pub. Act 94-804, § 1 (eff. May 26, 2006). It directed that the monies in the Fund to be distributed within 10 days of deposit into the Fund. 230 ILCS 5/54.5(b) (West 2006).

¶ 44    Declaring that "riverboat gaming continues to have a negative impact on horse racing," the legislature reiterated its findings when it reenacted the provisions in 2008. Pub. Act 95-1008, § 1 (eff. Dec. 15, 2008). It also found that the "prompt release and distribution" of the monies in the protest fund to purses and improvement and maintenance of the racing facilities was "urgently needed." Pub. Act 95-1008, § 1 (eff. Dec. 15, 2008). Given the urgency with which the legislature viewed the impact of riverboat gaming on the horse racing industry and that it ordered the monies in the Fund to be distributed within 10 days of deposit into the Fund, the legislature cannot possibly have intended that a substantial percentage of the Fund would remain undistributed in perpetuity.

¶ 45    The Board's solution to the problem of undistributed monies in the Fund was to craft an interpretation of the statute that met both the legislative intent stated above and the direction that the monies received by an eligible licensee under section 54.5(b)(2)(B) were to be used by the licensee "to improve, maintain, market, and otherwise operate its racing facilities to conduct live racing, which shall include backstretch services and capital improvements related to live racing and the backstretch" (230 ILCS 5/54.5(b)(2)(B) (West 2006)). By adding the proportion of handle generated at a racetrack by an ineligible licensee to the proportion of handle generated by the eligible licensee who controlled that racetrack, the Board ensured that the majority of the proportions making up "total handle" was accounted for in the distribution calculation.[6]

¶ 46    The Board's interpretation also ensured that the eligible licensee with majority operating control of a particular track received monies in proportion to the aggregate amount of racing conducted at the track, not just for the racing it conducted at the track. The legislature directed that those monies were to be spent to "improve, maintain, market, and otherwise operate its racing facilities to conduct live racing, which shall include backstretch services and capital improvements related to live racing." 230 ILCS 5/54.5(b)(2)(B) (West 2006). The Board's interpretation assures that the monies will cover the wear and tear caused by all racing at a racetrack, not just the controlling licensee' racing, and marketing for all races at the track, not just for the eligible licensee's.

¶ 47    The Board's interpretation of the statute is reasonable, especially when we consider that "aggregate" means "formed by combining into a single whole or total." This necessarily implies that an "aggregate proportion" may be comprised of multiple units. There would be

---

[6]Handle generated by Fairmount and the state fairs was not included in the Board's calculation of "total handle." This issue will be addressed below.

no need to use "aggregate" to modify "proportion" if only one proportion (the proportion of an eligible licensee's handle to total of all eligible licensees' handle) is involved in the distribution calculation as plaintiff argues. The Board's interpretation of "aggregate proportion of total handle" as including more than one proportion in the calculation of a licensee's share (including both the handle generated by an eligible licensee and the handle generated by a subordinate licensee racing at the eligible licensee's track) is reflective of the legislature's recognition that more than one proportion may be included in calculating each eligible licensee's share.

¶ 48    The result of the Board's interpretation is that distributions from the Fund will be made based on handle generated at a racetrack, rather than handle generated by an eligible licensee. In other words, shares would be determined based on the volume of racing at a particular track rather than on the volume of racing generated by a particular eligible licensee. We grant that the statute directs that distributions are to be made to a "person," an eligible licensee, and not to a racetrack. We also grant that the legislature had the necessary "racetrack" language available, as shown by the fact that it used the word "racetrack" in the immediately preceding paragraph in section 54.5(b)(2)(A). It could easily have directed that distributions should be made *pro rata* based on the proportion of handle generated at a racetrack. However, it could just as easily have directed that distributions should be made *pro rata* based on the proportion of handle that each licensee generated. It did neither, issuing instead a direction that is susceptible to more than one interpretation. As discussed above, the Board's interpretation of that direction conforms with the purpose of the legislation and is, therefore, reasonable. We agree with plaintiff that there is no language in the statute specifically supporting the Board's attribution of handle from an ineligible licensee to an eligible licensee. But that interpretation makes more sense than plaintiff's interpretation, which is the direct opposite of the legislature's direction that the relevant proportions be of "total handle," *i.e.*, all handle.

¶ 49                            Error in Calculation of Distributions

¶ 50    Plaintiff argues that, even if the Board's construction of section 54.5(b)(2)(B) is correct, the Board failed to apply its own interpretation because it did not actually include "all handle generated from live racing in Illinois" in its distribution calculation. Plaintiff asserts the Board's calculation of "total handle" failed to include the handle generated from wagering on races conducted in Illinois by Fairmount and at the state fairs in Springfield, Du Quoin and Brown Counties.

¶ 51    Hawthorne asserts plaintiff waived this argument because plaintiff did not raise it to the Board and did not raise it to the trial court until it filed its reply brief in support of its complaint for administrative review. Plaintiff did not waive this argument. Plaintiff (1) could not have raised this issue to the Board because the Board had not stated its interpretation of the statute at the time plaintiff was arguing the issue and (2) sufficiently raised it in its reply in support of its complaint.

¶ 52    Looking to the issue, as plaintiff points out, the Board's decision does not include handle generated by Fairmount and the state fairs in its calculation of "total handle." Its decision,

-12-

in the form of the staff memorandum, does not explain why this handle is excluded. The Board argues here that the statutory text does not mandate that the "aggregate proportion" used to determine the *pro rata* share of distributions for each eligible licensee, when added to the other shares, must equal 100% of the handle for all races in Illinois. We disagree. Of course the "aggregate proportion" shares added together must equal 100%. The handle in "aggregate proportion of total handle" would not be "total" if the relevant component proportions making up that total did not add up to 100%.

¶ 53 Nevertheless, we find as the Board did, that Fairmount's handle should not be included in "total handle" for the purposes of calculating "aggregate proportion of total handle." The legislature specifically directed in section 54.5(b)(2)(A) that Fairmount would receive 11% of the 40% share of the Fund intended for the improvement, maintenance, marketing and operation of racing facilities. Fairmount was the only licensee to which section 54.5(b)(2)(A) could ever apply and the legislature included that section specifically to provide Fairmount with a set percentage of the Fund. And, because Fairmount was already receiving a share of that 40%, the legislature directed that it could not also receive a share of the remaining 89% of that 40%.

¶ 54 Section 54.5(b)(2)(B) provides that the remaining 89% will be distributed to "any person *** who (i) had majority operating control of a racing facility at which live racing was conducted in calendar year 2002, (ii) is a licensee in the current year, and *(iii) is not eligible to receive monies under subparagraph (A) of this paragraph (2)*." (Emphasis added.) 230 ILCS 5/54.5(b)(2)(B) (West 2006). Section 54.5(b)(2)(B)(iii) can only apply to Fairmount, because Fairmount is the only licensee who can ever collect under section 54.5(b)(2)(A). Section 54.5(b)(2)(B)(iii) was specifically included in the statute to make sure that Fairmount did not receive two distributions from the Fund. It is entirely logical to exclude Fairmount's handle from "total handle" because it had already received monies from the Fund and the legislature specifically directed it should not receive a second share.

¶ 55 Notwithstanding plaintiff's argument to the contrary, the Board's interpretation does not treat Fairmount differently from Suburban and Associates. Unlike the handle generated by Suburban and Associates, Fairmount's handle is not excluded from "total handle" just because it does not meet one of the eligibility requirements of section 54.5(b)(2)(B). Its handle is excluded because, although it met the eligibility requirements in sections 54.5(b)(2)(B)(i) and (ii), it had already been awarded a substantial share of the Fund pursuant to section 54.5(b)(2)(A). Then, to make sure that Fairmount could not double-dip from the Fund, the legislature specifically took Fairmount's eligibility under sections 54.5(b)(2)(B)(i) and (ii) away by adding section 54.5(b)(2)(B)(iii). Because Fairmount had collected monies under section 54.5(b)(2)(A), the legislature eliminated any possibility of Fairmount's collecting again under section 54.5(b)(2)(B). Fairmount was ineligible for a section 54.5(b)(2)(B) distribution because the legislature took its eligibility away, not because, as with Suburban and Associates, it was never eligible in the first place.

¶ 56 Lastly, we consider whether the Board erred in not including the 2004 and 2005 handle generated by the Springfield State Fair, the Du Quoin State Fair and the Brown County Fair in its calculation of "total handle." Using the state fair handle shown in the record, adding that handle to the "total handle" used by the Board to generate a new total handle and then

approximating the relevant percentages, the 2004 and 2005 handle generated by the fairs was as follows:

| | | | |
|---|---|---|---|
| Springfield State Fair | $2,309,153 | handle | = .11% of new total handle |
| Du Quoin State Fair | $1,359,401 | handle | = .066% of new total handle |
| Brown County Fair | $46,921 | handle | = .0026% of new total handle.[7] |

¶ 57    The record appears to show that the state fairs each had majority operating control of a racing facility in 2002, were organization licensees in the "current year"/year of distribution/2009 and were not eligible for monies under section 54.5(b)(2)(A). Each was thus eligible for a distribution from the Fund under section 54.5(b)(2)(B). If the fairs are entitled to a distribution from the Fund, Springfield would receive an approximate distribution from the Fund of $29,953.01; Du Quoin, approximately $17,971.81; and Brown County, approximately $707.98.

¶ 58    The Board/staff memorandum did not address the state fair handle or whether the state fairs should receive a percentage of the Fund monies. The Board does little more on appeal, stating merely that the share of handle generated by the fairs is *de minimis* and accounted for less than one-sixth of one percent of wagering on live racing in Illinois in 2004 and 2005. We grant that the handle generated by the fairs and the concomitant shares of the Fund are minute in comparison with those of Arlington, Hawthorne, Maywood and Balmoral. However, though the effect of the fairs' handle may be negligible in its impact on the distribution of shares to Arlington, Hawthorne, Maywood and Balmoral, it does not mean that the fair handle is irrelevant. If the fairs meet the section 54.5(b)(2)(B) requirements, then under the statute, they are entitled to a *pro rata* distribution of the Fund monies. The Board is, therefore, ordered to amend its decision to address whether the state fairs are due a distribution from the Fund and, if a distribution is due, correct its distribution calculation accordingly.

¶ 59    In sum, the distribution calculation in section 54.5(b)(2)(B) is ambiguous. There are arguments to be made for both the Board's interpretation of that calculation and plaintiff's interpretation. However, the Board is charged with administering the Fund distributions under that statute and has many years of experience in managing the racing industry in Illinois. Accordingly, in our assessment of this ambiguous statute, we will defer to the Board's experience and expertise with the industry and with the legislature's intentions regarding that industry. We find the Board's interpretation of section 54.5(b)(2)(B) reasonable and supported by the legislature's intent in passing the Fund legislation. We affirm the Board's decision regarding how distributions under section 54.5(b)(2)(B) should be determined, *i.e.*, its decision that handle generated by an ineligible licensee at a track operated by an eligible licensee should be added to the handle of the eligible licensee for purposes of calculating the *pro rata* share due the eligible licensee. However, we reverse the Board's actual distribution calculation of the *pro rata* shares because it does not reflect the

---

[7]"Total Handle" is $2,068,043,694. Handle generated by the fairs is $3,715,475. Added together, the new total handle is $2,071,759,169. Combined fair handle accounts for .1786% of new total handle.

handle generated by the state fairs and the concomitant share of the Fund monies that state fairs should receive.

¶ 60                                    CONCLUSION

¶ 61        For the foregoing reasons, the circuit court's order affirming the decision of the Board is affirmed in part and reversed in part.

¶ 62        Affirmed in part and reversed in part.