# Illinois Official Reports

## Supreme Court

---

**Citibank, N.A. v. Illinois Department of Revenue, 2017 IL 121634**

---

| | |
|---|---|
| Caption in Supreme Court: | CITIBANK, N.A., Appellee, v. THE ILLINOIS DEPARTMENT OF REVENUE *et al.*, Appellants. |
| Docket No. | 121634 |
| Filed | November 30, 2017 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Patrick J. Sherlock, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield (David L. Franklin, Solicitor General, and Carl J. Elitz, Assistant Attorney General, of Chicago, of counsel), for appellants. |
| | Fred O. Marcus and David S. Ruskin, of Horwood Marcus & Berk Chtrd., and Jason Stiehl and Mark S. Bernstein, of Akerman LLP, both of Chicago, and Brian R. Harris, of Akerman LLP, of Tampa, Florida, and Peter O. Larsen, of Akerman LLP, of Jacksonville, Florida, for appellee. |

Justices             CHIEF JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Justices Freeman, Thomas, Kilbride, Garman, Burke, and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1     In this appeal, we review the determination of the Department of Revenue (Department) on a claim filed by Citibank, N.A. (Citibank), for tax refunds pursuant to the provisions of section 6 of the Retailers' Occupation Tax Act (ROTA) (35 ILCS 120/6 (West 2012)). Citibank sought refunds of ROTA taxes paid through affiliated retailers upon their sale of goods, transactions that were financed through Citibank, and that ultimately resulted in uncollectible debt, portions of which corresponded to the tax originally paid. The Department denied Citibank's claim. The circuit court of Cook County reversed the Department's decision. The appellate court affirmed the decision of the circuit court, concluding that Citibank had standing to pursue a refund of ROTA taxes, attributable to the uncollected debts, as a result of the assignments from the retailers. 2016 IL App (1st) 133650. We granted the Department's petition for leave to appeal (Ill. S. Ct. R. 315(a) (eff. Mar. 5, 2016)) and now reverse the judgment of the appellate court.

¶ 2     The ROTA imposes a tax " 'upon persons engaged in the business of selling at retail tangible personal property.' " *Kean v. Wal-Mart Stores, Inc.*, 235 Ill. 2d 351, 362 (2009) (quoting 35 ILCS 120/2 (West 2006)). The tax is computed as a percentage of "gross receipts" (35 ILCS 120/2-10 (West 2012)), defined as the "total selling price" (35 ILCS 120/1 (West 2012)). The retailer making the sale is responsible for remitting the tax to the Department. *Kean*, 235 Ill. 2d at 363. We are concerned here with the refund provisions of the ROTA.

¶ 3                    PRINCIPAL STATUTE AND ADMINISTRATIVE PROVISION
¶ 4     Section 6 of the ROTA, which governs issuance of credit memoranda or refunds of ROTA tax payments, provides in pertinent part:

"If it appears, after claim therefor filed with the Department, that an amount of tax or penalty or interest has been paid which was not due under this Act, whether as a result of a mistake of fact or an error of law, except as hereinafter provided, then the Department shall issue a credit memorandum or refund to the person who made the erroneous payment ***. *** If no tax or penalty or interest is due and no proceeding is pending to determine whether such person is indebted to the Department for tax or penalty or interest, the credit memorandum or refund shall be issued to the claimant; or (in the case of a credit memorandum) the credit memorandum may be assigned and set over by the lawful holder thereof, subject to reasonable rules of the Department, to any other person who is subject to this Act [or other specified tax acts]. ***

*** No credit may be allowed or refund made for any amount paid by or collected from any claimant unless it appears (a) that the claimant bore the burden of such amount and has not been relieved thereof nor reimbursed therefor and has not shifted such burden directly or indirectly through inclusion of such amount in the price of the

tangible personal property sold by him or her or in any manner whatsoever; and that no understanding or agreement, written or oral, exists whereby he or she or his or her legal representative may be relieved of the burden of such amount, be reimbursed therefor or may shift the burden thereof; or (b) that he or she or his or her legal representative has repaid unconditionally such amount to his or her vendee (1) who bore the burden thereof and has not shifted such burden directly or indirectly, in any manner whatsoever; (2) who, if he or she has shifted such burden, has repaid unconditionally such amount to his own vendee; and (3) who is not entitled to receive any reimbursement therefor from any other source than from his or her vendor, nor to be relieved of such burden in any manner whatsoever. No credit may be allowed or refund made for any amount paid by or collected from any claimant unless it appears that the claimant has unconditionally repaid, to the purchaser, any amount collected from the purchaser and retained by the claimant with respect to the same transaction under the Use Tax Act.

\* \* \*

If a retailer who has failed to pay retailers' occupation tax on gross receipts from retail sales is required by the Department to pay such tax, such retailer, without filing any formal claim with the Department, shall be allowed to take credit against such retailers' occupation tax liability to the extent, if any, to which such retailer has paid an amount equivalent to retailers' occupation tax or has paid use tax in error to his or her vendor or vendors of the same tangible personal property which such retailer bought for resale and did not first use before selling it, and no penalty or interest shall be charged to such retailer on the amount of such credit. However, when such credit is allowed to the retailer by the Department, the vendor is precluded from refunding any of that tax to the retailer and filing a claim for credit or refund with respect thereto with the Department. The provisions of this amendatory Act shall be applied retroactively, regardless of the date of the transaction." 35 ILCS 120/6 (West 2012).

¶ 5     The applicable administrative regulation promulgated by the Department (86 Ill. Adm. Code 130.1960 (2000)) purports to govern ROTA tax liability and tax relief for "lending agencies," "installment sales," and "bad debts," addressing each in separate subsections.[1] The issue in this appeal concerns eligibility for tax relief on account of bad debts. Hence, we consider here subsection (d), relating to "bad debts." Subsection (d), titled "Bad Debts," provides:

"1) In case a retailer repossesses any tangible personal property and subsequently resells such property to a purchaser for use or consumption, his gross receipts from such sale of the repossessed tangible personal property are subject to Retailers' Occupation Tax. He is entitled to a bad debt credit with respect to the original sale in which the default has occurred to the extent to which he has paid Retailers' Occupation Tax on a portion of the price which he does not collect, or which he is not permitted to retain because of being required to make a repayment thereof to a lending agency under a 'with recourse' agreement. Retailers of tangible personal property other than motor

_____

[1]Finance companies and other lending agencies are, generally, liable for payment of tax in cases in which they engage in the business of selling to users or consumers tangible personal property to which they hold or acquire title. 86 Ill. Adm. Code 130.1960(a) (2000).

vehicles, watercraft, trailers and aircraft that must be registered with an agency of this State may obtain this bad debt credit by taking a deduction on the returns they file with the Department for the month in which the federal income tax return or amended return on which the receivable is written off is filed, or by filing a claim for credit [as] provided in subsection (d)(3) of this Section. Because retailers of motor vehicles, watercraft, trailers and aircraft do not pay Retailers' Occupation Tax to the Department on retail sales of motor vehicles, watercraft, trailers, and aircraft with monthly returns, but remit the tax to the Department on a transaction by transaction basis, they are unable to take a deduction on the returns that they file with the Department, but may file a claim for credit with the Department, as provided in subsection (d)(3), on any transaction with respect to which they desire to receive the benefit of the repossession credit.

2) Retailers who incur bad debt on any tangible personal property that is not repossessed may also obtain bad debt credit as provided in subsections (d)(1) and (3).

3) In the case of tax paid on an account receivable that becomes a bad debt, the tax paid becomes a tax paid in error, for which a claim for credit may be filed in accordance with Section 6 of the Retailers' Occupation Tax Act, on the date that the Federal income tax return or amended return on which the receivable is written off is filed." 86 Ill. Adm. Code 130.1960(d) (2000).

¶ 6                                  BACKGROUND
¶ 7                          Departmental Proceedings
¶ 8        Citibank's claim was submitted to the Department's administrative law judge (ALJ) on stipulated facts. In the parties' stipulations, Citibank's business relationship with the pertinent Illinois retailers was explained as follows.

¶ 9        Citibank provided sales financing programs to numerous retailers in Illinois. As part of their normal business practice, the retailers offered customers the option of financing their purchases, including the amount of Illinois tax due on the purchases. Citibank would originate or acquire consumer charge accounts and receivables from the retailers on a non-recourse basis.[2] When a customer financed a purchase using the consumer's account, Citibank remitted to the retailer the amount the customer financed. That amount included some or all of the purchase price, depending upon whether the customer financed the entire purchase or only a portion of the purchase, and the amount of the tax owed based on the selling price of the property purchased. "The retailers then remitted the complementary amount of the [ROTA] tax they owed to the State for each transaction."

¶ 10       Under the agreements between Citibank and the retailers, Citibank acquired "any and all applicable contractual rights relating thereto, including the right to any and all payments from the customers and the right to claim Retailer's Occupation Tax (ROT) refunds or credits."

---

[2]As the term "non-recourse" suggests, a lender financing debt—Citibank in this case—would have no recourse or right against the other named parties—here the Illinois retailers who initiated the sale-on-credit transactions—in the event of default. See Black's Law Dictionary 1740 (9th ed. 2009) (defining "without recourse" as "without liability to subsequent holders").

¶ 11        Some of the customers subsequently defaulted on their accounts. Those defaults form the bases for Citibank's claim in this case. When the customers defaulted, they did not repay the full amount of the purchase price and the tax. After reasonable attempts to collect the balances that remained on the defaulted accounts, Citibank determined that they were worthless, *i.e.*, that they were "uncollectable and legal action to enforce payment would not result in the satisfaction of execution on a judgment."

¶ 12        Consequently, Citibank wrote the remaining balances off as worthless on its books and records. The stipulation specifically provides that "Citi[bank], and not the retailers, bore the economic loss on these defaulted accounts." Citibank claimed the remaining, unpaid balances on those accounts as bad debts, pursuant to section 166 of the Internal Revenue Code (26 U.S.C. § 166 (2006)), on its corporate income tax returns. The bad debts were written off over the period of January 1, 2008, to December 31, 2009, and were claimed on Citibank's corporate income tax returns covering that period.

¶ 13        On September 28, 2010, Citibank filed a claim for a refund or credit. In its claim, Citibank sought a refund of $1,600,853.32, which the parties in this case stipulated "is the portion of Account balances that were written off [by Citibank] as bad debts that is attributable to the ROT." It was further stipulated, however, that the tax claimed to have been overpaid by Citibank was "approximately 8% of the amount of the additional deductions reported *** while the Illinois ROT rate was (and remains) 6.25%." Moreover, it was undisputed that Citibank's claim did not contain some of the detailed information required to be reported within different parts of the form used by the Department. Apparently, that was at least *in part* because Citibank "did not engage in the occupation of retailing."

¶ 14        On January 31, 2011, the Department denied Citibank's claim. In response, Citibank requested an administrative hearing. In his recommendation for disposition, which was based on the foregoing stipulated facts, the presiding ALJ recommended that Citibank's claim be denied on the bases that (1) Citibank did not include all of the required information or sufficient detail on its application for a refund, (2) Citibank did not bear the burden of the ROTA tax, (3) the ROTA tax was not paid in error, (4) there was no evidence that any erroneously paid taxes were refunded to the consumer, (5) Citibank was not the remitter of the taxes to the State, and (6) the assignments from the retailers to Citibank did not give Citibank a right to a refund of the ROTA taxes. On December 13, 2012, the Director of the Department adopted the ALJ's recommendation. Citibank sought review in the circuit court.

¶ 15                                Circuit Court Decision
¶ 16        The circuit court identified the issue before it as "whether Plaintiff [Citibank] is entitled to a refund of tax that is equal to a portion of the ROT remitted to the Department by retailers for whom certain of Plaintiff's credit account customers made retail purchases of tangible personal property, and which accounts were later written off by Plaintiff as bad debts."

¶ 17        In enunciating preliminary principles of administrative review, the circuit court acknowledged potentially countervailing considerations as expressed in this court's opinions. The court noted the general principles that courts give "substantial weight and deference to an interpretation of an ambiguous statute by the agency charged with the administration and enforcement of the statute" and that "administrative regulations have the force of law and are construed under the same standards governing statutory construction." However, the circuit

- 5 -

court also emphasized the limitations upon an administrative agency's authority to promulgate regulations, observing that an administrative agency interpreting a statute "cannot expand statutory language by implication beyond its clear import" and that "a regulation cannot create requirements, exceptions, limitations or conditions that conflict with the express legislative intent as reflected in the statutory language."

¶ 18    The court also acknowledged—quoting this court's decision in *Peoples Store of Roseland v. McKibbin*, 379 Ill. 148, 152 (1942)—"that in the absence of statute, taxes voluntarily paid cannot be recovered no matter how meritorious the claim" and that section 6 of the ROTA "is a special remedial statute" (*id.*) limited to persons—"normally retailers," the circuit court conceded—who have paid the tax pursuant to the ROTA "by reason of mistake," what the circuit court characterized as "a tax that was not actually due."

¶ 19    Following a recitation of section 6 of the ROTA and subsection (d) of section 130.1960, the court first observed that it was "undisputed" that "had the retailers provided finance arrangements to their customers for purchases of tangible personal property, and the customers then defaulted on those, *** the retailers would be entitled to a refund of the tax." The court then focused on the applicable administrative regulation, commenting that subsection (d)(3) is controlling, "not sections (d)(1) or (2) as the ALJ stated."[3] The court went on to assert, however, "even if the issue was whether plaintiff was a retailer, the retailers properly assigned all their rights to plaintiff, who therefore stepped into the shoes of the retailer and is entitled to the refund."

¶ 20    The court stated that subsection (d)(3) is "not limited to accounts receivable held only by retailers." The court believed it could not be so limited, as to do so would be to "impose a limitation on a statute that the legislature did not prescribe." "Because the legislature did not limit section 6 of ROTA to retailers, the Department's regulation, 86 Ill. Adm. Code § 130.1960, cannot limit section 6 to retailers." The circuit court observed that section 6 references the right of a "claimant"—not a "retailer"—to a credit or refund for—in the words of the court—"any amount of tax or penalty or interest that has been paid which was not due under the Act."

¶ 21    Thus, in the court's view, Citibank was entitled to a credit or refund so long as Citibank met the conditions specified in the second paragraph of section 6 of the ROTA, which the court paraphrased as follows: (1) plaintiff bore the burden of such tax amount; (2) plaintiff has not been reimbursed for the tax or shifted the burden of the tax; and (3) no understanding or agreement exists whereby plaintiff may be relieved of the burden of such amount, be reimbursed therefor, or shift the burden thereof.

¶ 22    With respect to the first requirement, the circuit court observed, "[i]n a normal situation under the ROTA, the retailers shift the burden of the tax to the consumer by including it in the purchase price." The court reasoned, if the burden could be shifted in that way, it could "similarly be shifted to a finance company such as plaintiff." The court noted that the parties had stipulated that Citibank had supplied some or all of the purchase price to the retailer, which included the tax the purchaser owed based on the selling price. Although the retailers remitted to the Department the total ROTA payment due on the purchase price, the court observed it

---

[3]Subsections (d)(1) and (d)(2) *specifically* refer to retailers; subsection (d)(3) does not but is referenced in subsection (d)(2) as a remedy for "retailers."

was *Citibank* that had advanced funds corresponding to financed tax amounts yet to be paid by the purchasers. Citibank paid those amounts through the retailers as intermediaries. In light of that reality, the court found *Citibank* bore the burden of the tax.

¶ 23 The court further found, per the additional section 6 requirements, that Citibank had not been reimbursed for the tax paid, as the purchasers had defaulted on the accounts, and, because of the "without recourse" transaction with the retailers, there was no agreement whereby Citibank could be relieved of the tax burden. The circuit court rejected the ALJ's insistence that Citibank would have to repay to the purchasers the tax collected from them before plaintiff could claim a refund on tax amounts it had financed. The court noted: "Plaintiff cannot repay something it never received in the first place." The court observed that Citibank was not seeking a refund for tax amounts paid by the purchasers; it was seeking, pursuant to stipulated fact, the portion of account balances that were written off by Citibank as "bad debt[ ] that is attributable to the ROT."

¶ 24 Addressing the effect of assignment, citing this court's opinion in *People ex rel. Stone v. Nudelman*, 376 Ill. 535, 539 (1940), the circuit court noted the general rule that, in the absence of language in the statute prohibiting it, claims against the government are assignable. The court believed there was no such prohibition in either section 6 of the ROTA or section 130.1960 of the Administrative Code. As an assignment operates to transfer to the assignee all of the assignor's right, title, or interest in the thing assigned, the court concluded that Citibank "stepped into the shoes of the retailers" for purposes of claiming a refund.

¶ 25 The circuit court dismissed the ALJ's various findings regarding plaintiff's failure to submit detailed financial information and documentary evidence in support of its claim, reasoning that the referenced information was not required by section 6 or the Department's forms.

¶ 26 The circuit court reversed the ruling of the Department, concluding that plaintiff, Citibank, was entitled to a refund pursuant to section 6 of the ROTA. The Department appealed.

¶ 27 Appellate Court Opinion

¶ 28 The appellate court affirmed the judgment of the circuit court, holding that (1) the assignment of the right to pursue a refund of ROTA taxes paid was not precluded by the ROTA, (2) assignment was not precluded by public policy, (3) the failure to submit supporting documentation regarding the amount of ROTA taxes paid did not preclude a refund, based upon the stipulated facts, and (4) Citibank was in fact entitled to a refund. 2016 IL App (1st) 133650.[4]

¶ 29 The appellate court found, "even if only remitting retailers have standing under the statute, the retailers in the present case effectively assigned their rights to pursue a refund to Citibank." *Id.* ¶ 31. The appellate court cited, at the outset, this court's opinion in *Kleinwort Benson North America, Inc. v. Quantum Financial Services, Inc.*, 181 Ill. 2d 214, 225 (1998), wherein this court stated: "Today, assignability is the rule and nonassignability is the exception." However, as the appellate court acknowledged (2016 IL App (1st) 133650, ¶ 32) and this court noted in

---

[4]The appellate court's disposition concerned consolidated appeals by Citibank and Chrysler Financial Services America, LLC. The appeal of the latter was dismissed for lack of jurisdiction and will not be further referenced here.

*Kleinwort* (see *Kleinwort*, 181 Ill. 2d at 224), public policy is an important consideration in determining whether an action or right is assignable.

¶ 30    In that regard, the appellate court first looked to section 6 to see if the statute prohibited or limited assignment of the right to a tax refund. The court found no overt restriction in the statutory language. The court stated: "Even if section 6 bestows the right to a tax refund solely upon the remitter of the tax, that does not mean that after the initial bestowment, the remitter is not free to do what it pleases with that right." 2016 IL App (1st) 133650, ¶ 36. The appellate court referenced this court's decision in *Stone*, stating in an accompanying parenthetical, "because the language of the statute did not limit what could be done with a credit memorandum after it was issued or otherwise discuss its assignability, the credit memo was assignable." *Id.* (citing *Stone*, 376 Ill. at 539).

¶ 31    The court next addressed the Department's argument that the assignment of a right to an ROTA tax refund violates public policy (1) because it could result in the refund of taxes not actually paid, leading to the unjust enrichment of persons who did not pay the taxes themselves, and (2) because Citibank was otherwise compensated through vendor discounts, cardholder charges, and interest payments. *Id.* ¶ 37.

¶ 32    Speaking to the first concern, the appellate court acknowledged the Department's contentions that mistakenly issued refunds are more likely where refunds are afforded to those outside "an existing taxpayer/collector relationship" and that *Citbank's* claim, specifically, was inadequate insofar as Citibank had failed "to present documentation evidencing the transactions underlying the bad debts." *Id.* However, the appellate court found the Department's arguments *in this case* unavailing because, in the view of the appellate court, "any lack of documentation on the part of Citibank appears to have been a result of the parties' stipulation to the amount of taxes attributable to the uncollected debt, not Citibank's status as an assignee." *Id.* In any event, looking to the future, the appellate court offered this assurance: "[T]he conclusion that the right to a refund under section 6 is assignable does not alter the procedural requirements a claimant—whether remitter or assignee—must comply with before a refund will be issued. Therefore, the Department is still free to vet applications for refunds in the same manner it always has." *Id.*

¶ 33    The appellate court found irrelevant the Department's second concern, *i.e.*, that Citibank—and other lenders similarly situated—are already adequately compensated for their bad debt risk through vendor discounts, cardholder charges, and interest payments. *Id.* ¶ 38. The court stated, "what constitutes fair compensation belongs to the parties to the agreement" and concluded "regardless of whether the vendor discounts, cardholder charges, and interest payments do, in fact, adequately compensate Citibank for the risks they [*sic*] run in financing purchases by consumers, it is inappropriate to invoke public policy to undo an agreement between the parties." *Id.*

¶ 34    Turning to the applicable administrative regulation—section 130.1960(d)—the appellate court considered and rejected the Department's argument that Citibank is not entitled to a refund via the assignments because the retailers would not be entitled to a refund under the present circumstances. *Id.* ¶ 39. Before the appellate court, the Department argued, to take advantage of the bad debt credit of section 130.1960(d), *the retailer* must have either financed the sale itself or have a "with recourse" agreement with the lender. *Id.* The appellate court conceded the latter was inapplicable, as the agreement between Citibank and the retailers was

without recourse. *Id.* ¶ 41. However, according to the appellate court, "[e]ven assuming that the bad debt credit regulation requires that a retailer self-finance, the parties' stipulation indicates that is what happened here." *Id.* The appellate court observed that the parties' stipulations suggested "the retailers entered into financing agreements with the consumers directly and then sold and assigned their rights under those financing agreements to Citibank in exchange for payment of the financed amount." *Id.* ¶ 42.

¶ 35     The appellate court also rejected the Department's contention that the retailers would not have been able to obtain a refund because there is no evidence that any of the ROTA taxes were refunded to the consumers. *Id.* ¶ 44. The court first pointed out that section 6 of the ROTA requires only that the claimant reimburse the purchaser for any amount of taxes actually "collected from the purchaser and retained by the claimant." (Internal quotation marks omitted.) *Id.* ¶ 41. The court reiterated that the parties had stipulated that Citibank sought a refund only of ROTA taxes Citibank had paid but did not thereafter collect from the consumers due to the consumers' defaults. The court noted that the retailers did not collect the tax amounts in question from the consumers; they collected them from Citibank. *Id.* Had there been "no deal with Citibank," "the retailers would not have been required to refund to the consumers taxes that the consumers had not paid in the first place." *Id.* ¶ 44.

¶ 36     Finally, the appellate court found unavailing the Department's contention that Citibank was not entitled to a refund because it failed to provide required information and documentation in support of its claim. *Id.* ¶ 46. Again, the appellate court resorted to the parties' stipulation that the amount Citibank sought to have refunded was "the portion of balances that were written off as bad debts that is attributable to the Retailers' Occupation Tax," concluding, as a result of that stipulation, "[a]ny deficiency in Citibank's application for refund or supporting documentation is moot." *Id.* ¶¶ 46-47.

¶ 37     The appellate court thus affirmed the judgment of the circuit court, holding that Citibank, pursuant to the retailers' assignments, had a right to the refund claimed.

¶ 38                                    ANALYSIS

¶ 39     The construction of a statute is a question of law that is reviewed *de novo*. *In re Estate of Dierkes*, 191 Ill. 2d 326, 330 (2000). In construing the meaning of a statute, this court's primary objective is to ascertain and give effect to the intent of the legislature. In that regard, the language of the statute provides the best indication of the legislature's intent. *In re Consolidated Objections to Tax Levies of School District No. 205*, 193 Ill. 2d 490, 496 (2000). Considerations of *stare decisis* weigh heavily in the area of statutory construction, especially where the legislature is free to change court interpretation of its legislation. *People v. Reese*, 2017 IL 120011, ¶ 95. In the event there *is* ambiguity in a statute, we may look to other sources to ascertain the legislature's intent. *People ex rel. Birkett v. City of Chicago*, 202 Ill. 2d 36, 46 (2002). In such an instance, this court will give substantial weight and deference to an interpretation of an ambiguous statute by the agency charged with administering and enforcing that statute. In fact, a reasonable construction of an ambiguous statute by the agency charged with that statute's enforcement, if contemporaneous, consistent, long-continued, and in concurrence with legislative acquiescence, creates a presumption of correctness that is only slightly less persuasive than a judicial construction of the same act. *Id.*

¶ 40     It has long been acknowledged that, in the absence of an authoritative statute, taxes voluntarily, though erroneously, paid cannot be recovered. *Snyderman v. Isaacs*, 31 Ill. 2d 192, 194 (1964). As stated in *Stone*, there is a "rule requiring strict construction of a tax refunding statute," and that rule is "intended for the protection of the State." *Stone*, 376 Ill. at 538. Thus, the refunding statute must specifically provide for the relief requested.

¶ 41     Before this court, with respect to the interpretation of section 6 of the ROTA and section 130.1960(d), the parties' arguments essentially mirror those advanced in the lower courts. Beyond the points raised below, the parties here argue the implications of section 6d of the ROTA as they relate to legislative intent and public policy, recognizing that amendment has no direct application to the refunds sought in this case.[5] The parties' principal reliance upon this court's precedent appears to focus on three cases: *Kleinwort*, *Stone*, and *Snyderman*.

¶ 42     We begin with *Kleinwort*. In that case, this court considered whether punitive damages could be recovered by assignees after a common-law fraud claim brought by a corporation was assigned to the corporation's former shareholders.[6] This court ultimately held that the assignment of a punitive damages claim would not violate public policy.

¶ 43     As referenced in the appellate court's opinion in this case, the *Kleinwort* court announced, at the outset of its analysis, the modern view on assignability: "Today, assignability is the rule and nonassignability is the exception." *Kleinwort*, 181 Ill. 2d at 225 (citing 6 Am. Jur. 2d *Assignments* §§ 7, 29 (1963)). This court observed: "Basically, in Illinois, the only causes of action that are not assignable are torts for personal injuries and actions for other wrongs of a personal nature, such as those that involve the reputation or feelings of the injured party. [Citation.] These limitations are based primarily on public policy concerns." *Id.*

¶ 44     The *Kleinwort* court then enunciated "[s]ome general principles that determine when an agreement between parties violates public policy." *Id.* at 226. The court noted, first and foremost, courts should look to Illinois's constitution, its statutes, and the decisions of its courts because pronouncements of public policy are found therein. Beyond that inquiry, in deciding whether an agreement violates public policy, courts determine whether the agreement is so capable of producing harm that its enforcement would be contrary to the public interest. This court observed that courts should "apply a strict test in determining when an agreement violates public policy," stating that "[t]he power to invalidate part or all of an agreement on the basis of public policy is used sparingly because private parties should not be needlessly hampered in their freedom to contract between themselves." *Id.* The *Kleinwort* court noted whether an agreement is contrary to public policy depends on the particular facts and circumstances of the case. *Id.*

¶ 45     Applying those considerations to the agreement in question, the *Kleinwort* court concluded "allowing the assignees to seek punitive damages does not violate any public policy." *Id.* This court observed that the two assignees were shareholders of the assigning corporation at the time of the alleged fraud and they were "intimately involved in the negotiations for the purchase of [the brokerage firm at issue]," which served as the basis for the alleged fraud, and

---

[5]Citibank's 2010 claim for a refund or credit predates that section. Pub. Act 99-217 (eff. July 31, 2015) (adding 35 ILCS 120/6d).

[6]The right of assignees to recover compensatory damages was not contested, assuming same were proven.

"[t]hey were involved in the litigation long before [the assigning corporation's] claims were assigned to them." *Id.* at 226-27. This court cited, approvingly, *Puckett v. Empire Stove Co.*, 183 Ill. App. 3d 181, 191-92 (1989) (assignment of contribution claim did not violate public policy where assignee was closely involved in the events leading up to the litigation). *Kleinwort*, 181 Ill. 2d at 227.

¶ 46    We turn now to consideration of this court's decisions in *Stone* and *Snyderman*. Citibank argues that *Stone* dictates the result here; the Department argues that *Snyderman* controls. Neither case is directly on point; however, in view of the statutory taxing structure—including that of the refund statute—the observations in *Snyderman* are more compelling.

¶ 47    At issue in *Stone* was whether the version of the ROTA refund statute then extant allowed assignment of a credit memorandum issued to the original remitter of ROTA taxes after a claim had been submitted to the Department by the original taxpayer, verified, and allowed. In *Stone*, the company that paid the taxes received a credit memorandum as a result of erroneous payment but ceased doing business and was thus no longer liable for the payment of ROTA taxes to which the credit amount could be applied. The memorandum, an asset of the company, was turned over to a trustee, who sold and assigned the memorandum.

¶ 48    The *Stone* court began its analysis with the recognition that "[t]he result of erroneous payment of tax is that the State has in its possession funds which, in equity and justice, belong to the person erroneously paying it." *Stone*, 376 Ill. at 538. The court noted, at that time, the ROTA provided "nothing about [memorandum] assignment"; therefore, the court found that "assignability or non-assignability" should be "determined by the general law of assignability." *Id.* at 539. In that respect, this court observed: "The general rule, in the absence of language of the statute prohibiting it, is that claims against the government are assignable." *Id.* In holding that the credit memorandum was assignable, the *Stone* court quoted, approvingly, from an Oklahoma decision, wherein that court stated: " 'The right to assign a debt *which is due and fully earned* is unquestioned by all the courts of this country, and even if the language "or his assigns" were not in the act, we entertain no doubt but what the party to whom the contract was let could assign any money *due him* under the same.' " (Emphases added.) *Id.* (quoting *Leader Printing Co. v. Lowry*, 59 P. 242, 245 (Okla. 1899)).

¶ 49    Citibank asserts that *Stone* supports its position that a contingent right to a refund was assignable by its affiliated retailers. In our view, the holding of *Stone* is more limited: it stands for the proposition that—at a time when the pertinent statute did not otherwise address assignments—a credit memorandum, representing a liquidated right and amount as determined by the Department, was a property asset that could be assigned.

¶ 50    In *Snyderman*, assignment and credit memoranda were not factors; this court considered whether there was a right to a refund under an entirely different scenario. In 1961, the ROTA and the complementary Use Tax Act were amended to apply to the *rental* of personal property and the use of rented personal property. In *International Business Machines Corp. v. Department of Revenue*, 25 Ill. 2d 503 (1962), those amendments were held invalid because they violated section 13 of article IV of the constitution (Ill. Const. 1870, art. IV, § 13). Subsequently, plaintiff Snyderman brought an action on behalf of himself and others similarly situated who, during the period that the invalid tax was collected, had rented motor vehicles and paid the leasing tax, which was ultimately submitted to the Department by the lessors.

*Snyderman*, 31 Ill. 2d at 193. Plaintiff submitted that he and the others had borne the burden of the tax. *Id.*

¶ 51 The *Snyderman* court identified a principal issue presented as "whether under the facts alleged a lessee may maintain an action directly against the Director of Revenue to recover tax payments made through his lessor." *Id.* at 194. As to that issue, the court first noted, "in the absence of an authoritative statute, taxes voluntarily, though erroneously, paid, cannot be recovered." *Id.*

¶ 52 With respect to these particular taxing statutes, the court explained that the "pattern of the taxing statutes contemplated that in the usual case the lessee would not himself remit the tax directly to the State, but would instead pay the amount of the tax to his lessor as use tax,[7] and the lessor would remit the money to the State as retailers' occupation tax." *Id.* at 195. Given that statutory structure, the *Snyderman* court expressed concern that the "refund of a tax erroneously paid in such an indirect manner carries with it obvious possibilities of unjust enrichment, and the statutory procedures by which a refund or credit may be obtained show a legislative awareness of those possibilities." *Id.* The court observed that both the ROTA and Use Tax Act (Ill. Rev. Stat. 1961, ch. 120, ¶ 439.19) contained similar provisions authorizing credit to the person who erroneously paid the tax in question. *Snyderman*, 31 Ill. 2d at 195-96. The court continued:

> "In these provisions there is recognition of the possibility that the state may be unjustly enriched through the retention of taxes erroneously paid, and a remedy has been provided. There is recognition also that a refund procedure without safeguards might result in refunds of taxes that had not actually been remitted, or in the unjust enrichment of persons who had not themselves paid the tax, but had passed its burden on to another. To protect the real taxpayer and to prevent unjust enrichment of any other party, the legislature has provided both in the Use Tax Act and in the Retailers' Occupation Tax Act that the only person entitled to receive credit is the remitter of the tax. And it has also required that where the remitter has not himself borne the burden of the tax, he must directly or indirectly reimburse the actual taxpayer before filing his claim with the Department." *Id.* at 196.

¶ 53 In the view of the court, the complaint made clear that the lessee-plaintiff did not remit the tax, and consequently, the "lessee has no statutory right to recover taxes remitted by his lessor. That conclusion necessarily makes applicable the general rule that without legislative authorization voluntary tax payments can not be recovered." *Id.*

¶ 54 The Department argues that *Snyderman* prohibits refunds to someone other than the remitter of the tax, even if the claimant-party was the actual source of the funds.

¶ 55 We turn now to independent examination of the content of section 6 of the ROTA. As noted previously, at the time *Stone* was decided, the predecessor provision of section 6 (Ill. Rev. Stat. 1939, ch. 120, § 445) did not address assignment. It does now. After referencing

---

[7]As this court noted in *Kean*, the ROTA and Use Tax Act are complementary. *Kean*, 235 Ill. 2d at 362. "In the usual case, the use tax is collected from the purchaser by the retailer, who must remit the tax to the Department of Revenue. [Citations.] A retailer, however, is relieved of the duty of remitting the use tax it collects if it has paid to the Department the retailers' occupation tax upon the gross receipts from the same sale." *Id.* at 363.

issuance of a "credit memorandum or refund" "to the claimant," in the same sentence, the statute provides, "(in the case of a credit memorandum) the credit memorandum may be assigned and set over by the lawful holder thereof, subject to reasonable rules of the Department, to any other person who is subject to this Act, the Use Tax Act, [or other specified taxes]" (35 ILCS 120/6 (West 2012)), *i.e.*, those who might apply the credit to their future tax liability. With respect to assignability, the statute speaks only to a remitter's present possession of a "credit memorandum," an adjudicated claim, an asset in hand. Section 6 mentions both "retailers" and "claimants" at various points. The statute references "claimants," generally, but refers specifically to "retailers" in two places: the term "retailer" is used in conjunction with the sale of motor vehicles, and it is used in the last paragraph of section 6 to differentiate a "retailer," *i.e.*, the seller of goods to the purchasing consumer, from the "vendor" who sold to the "retailer." *Id.* However, the only "person" to whom "the Department shall issue a credit memorandum or refund" is "the person who made the erroneous payment," *i.e.*, the retailer.

¶ 56    We next consider section 130.1960(d), the administrative regulation that was apparently promulgated by the Department to implement section 6. Subsection (d) addresses "bad debts," a matter that is not mentioned in section 6 of the ROTA. Subsections (d)(1) and (d)(2) specifically mention "retailers"—in the first instance those who repossess and subsequently resell tangible personal property, in the latter those who incur bad debt without repossession—and subsection (d)(3) does not use the term "retailers." However, it appears that subsection (d)(3) was intended, by the Department, to specify a means by which retailers who do not repossess may obtain tax relief. Moreover, and perhaps more significantly, via subsection (d)(3), the Department proffers a definition of a "tax paid in error" that the legislature had not used or specifically sanctioned, that is, a "tax paid on an account receivable that becomes a bad debt." See 86 Ill. Adm. Code 130.1960(d)(3) (2000). The Department's regulation relating to bad debt remained the only applicable authority on the subject for a period of 15 years.

¶ 57    Then, the legislature specifically addressed deductions for uncollectible debt and correlative tax relief in 2015 with the addition of section 6d to the ROTA. Pub. Act 99-217, § 15 (eff. July 31, 2015). By its terms, that section applies only to "accounts or receivables *** charged off as bad debt on the lender's books and records on or after January 1, 2016" (35 ILCS 120/6d(b)(1)(A) (West 2016)), so it has no direct application here—and no one claims that it does. Rather, the parties argue its relevance with respect to legislative intent and public policy and attempt to spin it in such a way as to support their respective positions.

¶ 58    The Department contends that the legislature's recent authorization of ROTA relief for retailers who use "private-label credit cards" to finance a sale resulting in bad-debt expense does not support Citibank's position because "Citibank was not a private label card lender" and it is not a "retailer." The Department argues, with respect to the traditional lender-retailer financing relationship, the lender is otherwise compensated for risk. It does not provide its financing services for free to its merchants and cardholders, as merchants are typically required to discount their reimbursement requests to secure "non-recourse" financing from banks and purchasers often incur fees and/or pay interest on outstanding debt. The Department suggests that section 6d also reflects legislative concern over reporting problems that might be occasioned by third-party claims for refunds and the potential for unjust enrichment—a valid concern this court acknowledged in *Snyderman*. Thus, that section restricts refunds for bad

- 13 -

debt to the retailer who made and financed the sale. The Department characterizes Citibank's arguments as "an end-run around the legislative objectives of section 6d of the Act."

¶ 59    Citibank claims the addition of section 6d is an indication that "the legislature is continuing its policy of refunding excess sales tax in all credit sales so that the proper amount of sales tax is ultimately retained when bad debts occur." Citibank suggests, without supporting reference, that the legislature was "undoubtedly aware of this litigation," and Citibank finds it noteworthy that the legislature, in the new amendment, "did not take the opportunity" to "place any limitations on a retailer's ability to assign its right to a tax refund." It is not clear to us why the legislature would feel the need to limit an open-ended right of assignment to a lender in the context of tax refunds when it has never *recognized* such a right in the first place.

¶ 60    With respect to section 6d and its significance for purposes of ascertaining legislative intent and the parameters of public policy, we make the following observation. The statute authorizes tax relief only for "the retailer" and requires all reporting to the Department only through "the retailer."

¶ 61    Subsection (a) provides:

> "*A retailer* is relieved from liability for any tax that becomes due and payable if the tax is represented by amounts that are found to be worthless or uncollectible, have been charged off as bad debt *on the retailer's books and records* in accordance with generally accepted accounting principles, and have been claimed as a deduction pursuant to Section 166 of the Internal Revenue Code on the income tax return filed *by the retailer. A retailer that has previously paid such a tax* may, under rules and regulations adopted by the Department, *take as a deduction the amount charged off by the retailer*. If these accounts are thereafter, in whole or in part, collected *by the retailer*, the amount collected shall be included in the first return filed after the collection, and the tax shall be paid with the return." (Emphases added.) 35 ILCS 120/6d(a) (West 2016).

¶ 62    Subsection (b) addresses "the payment of taxes on purchases made through a private-label credit card"—not credit cards generally, "a private-label credit card."[8] 35 ILCS 120/6d(b) (West 2016). It provides, in subsection (b)(1),

> "[i]f consumer accounts or receivables are found to be worthless or uncollectible, *the retailer may claim a deduction* on a return in an amount equal to, *or may obtain a refund of*, *the tax remitted by the retailer on the unpaid balance* due if:
>
>> (A) the accounts or receivables have been charged off as bad debt on the lender's books and records on or after January 1, 2016;
>>
>> (B) the accounts or receivables have been claimed as a deduction pursuant to Section 166 of the Internal Revenue Code on the federal income tax return filed by the lender; and

---

[8]A restrictive definition is provided in the statute, wherein a " '[p]rivate-label credit card' " is defined as "a charge card or credit card that carries, refers to, or is branded with the name or logo of a retailer and may only be used to make purchases from that retailer or that retailer's affiliates." 35 ILCS 120/6d(c)(3) (West 2016).

(C) a deduction was not previously claimed and a refund was not previously allowed on that portion of the account or receivable." (Emphases added.) 35 ILCS 120/6d(b)(1) (West 2016).

¶ 63 Subsection (b)(2) mandates an accounting and reporting procedure to be employed in the event that *either* "the retailer or the lender subsequently collects, in whole or in part, the accounts or receivables for which a deduction or refund has been granted under paragraph (1)," and it is "*the retailer* [that] must include the taxable percentage of the amount collected in the first return filed after the collection and pay the tax on the portion of that amount for which a deduction or refund was granted." (Emphasis added.) 35 ILCS 120/6d(b)(2) (West 2016).

¶ 64 Though, in subsection (b)(5), the legislature requires *both* "[t]he retailer and lender" to "maintain adequate books, records, or other documentation supporting the charge off of the accounts or receivables for which a deduction was taken or a refund was claimed under this Section" (35 ILCS 120/6d(b)(5) (West 2016)), subsection (b)(5) specifies, immediately after announcing that requirement, that "[a] *retailer* claiming a deduction or refund for bad debts from purchases made using a private label credit card shall meet the same standard of documentation as a retailer that claims a deduction or refund for bad debts that are from purchases made not using a private label credit card." (Emphasis added.) *Id.* It is not the lender who may claim a deduction (clearly not available to anyone who has no obligation to remit taxes in the future) or a refund; rather, it is the retailer who may do so, whether the sale was made using a private label credit card or not. In that vein, subsection (b)(4)(C) makes clear that the "deduction or refund allowed under this Section" "may only be taken by *the taxpayer*, or its successors, *that filed the return and remitted tax on the original sale on which the deduction or refund claim is based*." (Emphases added.) 35 ILCS 120/6d(b)(4)(C) (West 2016).

¶ 65 Given the legislature's clearly expressed preference in the statutory framework for reporting, remission, and refund *only* through the retailer, we find Citibank's position untenable—indeed "an end-run around" the statutes enacted by the legislature.

¶ 66 At the time *Stone* was decided, the pertinent statutory provision did not even mention assignments. After *Stone*, the legislature addressed assignments and sanctioned them only to the extent that a claim had been adjudicated and allowed, resulting in a "credit memorandum" issued to the taxpayer. In that instance only, the legislature provided for the taxpayer's limited assignment of the memorandum "to any other person *who is subject to this Act* [or other specified tax acts]." (Emphasis added.) 35 ILCS 120/6 (West 2012). In other words, there could only be an assignment of a credit memorandum, and only to a taxpayer obligated to pay the Retailers' Occupation Tax or the other referenced taxes, *i.e.*, one who could use the "credit." Although *that* right of assignment is mentioned, no mention was, or is, made of any other assignable, existing or prospective, right. Moreover, the statute is clear that a credit memorandum has to be in existence for the right of assignment to apply. Obviously, that limited statutory right of assignment is not applicable to the facts of this case.

¶ 67 Then there is this court's 1964 decision in *Snyderman*, which has occasioned no statutory change in the intervening years. We thus presume the legislature is in accord with this court's interpretation of the statute. See *Reese*, 2017 IL 120011, ¶ 95. In *Snyderman*, this court held that the lessee of property, the party who was the actual source of the money that found its way into state coffers, could not maintain his claim for a refund because the legislature had provided, in the ROTA, "the only person entitled to receive credit is the remitter of the tax."

*Snyderman*, 31 Ill. 2d at 196. The statute still provides, given an appropriate claim, that "the Department shall issue a credit memorandum or refund *to the person who made the erroneous payment*." (Emphasis added.) 35 ILCS 120/6 (West 2012). In other words, the payment or credit goes to the remitter of the tax. If the lessee in *Snyderman*, who was the source of the funds used to pay the tax, could not maintain an action for a refund, then it seems as clear that Citibank, in this case the source of the funds that the retailers remitted to the Department, is in no better position. A significant analytical thread that runs through *Snyderman* is the recognition that the legislature has insisted upon direct Departmental interaction with the original remitter of the tax in refund matters because to proceed otherwise undermines statutory safeguards.

¶ 68    The legislature has not only acquiesced in that interpretation over the intervening 64 years, it has now put its imprimatur upon that construction of statutory procedure. Section 6d of the ROTA not only confirms an element of the Department's regulation that some might say sought to resolve a matter of statutory ambiguity—whether, for purposes of section 6, a "tax paid on an account receivable that becomes a bad debt *** becomes a tax paid in error" (see 86 Ill. Adm. Code 130.1960(d)(3) (2000))—it also makes abundantly clear that all refund or credit claims—whether on a bad debt or otherwise—go through the retailer, the original remitter of the tax. The ROTA is, after all, the *Retailers'* Occupation Tax Act. It appears to us that allowing claims by the lender via assignment would circumvent the legislature's statutory policy—recognized by this court as far back as at least the *Snyderman* decision—of requiring refund requests to be submitted through the remitter of the tax, so as to avoid reporting problems that might arise. We conclude it is not the intent of the legislature, as expressed in its statutory enactments, to allow a direct action for a refund by a lender against the Department under these circumstances.

¶ 69    Our holding does not leave lenders like Citibank without a remedy in the future so long as they account for this circumstance in their agreements. Sophisticated lending institutions no doubt anticipate the eventuality of default and can order their commercial relationships accordingly.

¶ 70    We note, in closing, that the legislature has broad latitude and discretion in drawing statutory classifications to benefit the general welfare. *Big Sky Excavating, Inc. v. Illinois Bell Telephone Co.*, 217 Ill. 2d 221, 240 (2005). The responsibility for the wisdom of legislation rests with the legislature, and courts may not rewrite statutes to make them consistent with the court's idea of orderliness and public policy. *Board of Education of Roxana Community School District No. 1 v. Pollution Control Board*, 2013 IL 115473, ¶ 25; *People v. Carpenter*, 228 Ill. 2d 250, 270-71 (2008). Whether a windfall results in this circumstance—and it is far from clear that it does where tax is properly paid on the selling price—is not for us to decide. Our function is to ascertain the intent of the legislature as expressed in the language and framework of its statutory enactments. If this interpretation is *not* what the legislature intended, we urge legislators to revisit this issue and make their intent manifest.

¶ 71    For the foregoing reasons, the judgment of the appellate court is reversed.

¶ 72    Reversed.